IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TED PALLADENO, et al., | Case No. 2: 16 CV 1126 |
| Toledo Correctional Institution | |
| 2001 East Central Avenue | Judge Watson |
| Toledo, Ohio 43608 | |
| Plaintiffs, | Magistrate Jolson |
| vs. | |
| | |
| GARY C. MOHR, et al., | COMPLAINT |
| Ohio Department of Rehabilitation | |
| And Correction | |
| Operations Support Center | CLASS ACTION (42 USC § 1983) |
| 770 West Broad Street | JURY TRIAL DEMANDED |
| Columbus, Ohio 43222, | |
| Defendants. | |

AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY
RELIEF PURSUANT TO TITLE 42 U.S.C § 1983- JURY TRIAL DEMANDED

THE LAW OFFICE OF ERIC J ALLEN, LTD
Eric J. Allen
4605 Morse Road, Suite 201
Gahanna, Ohio 43230
Ph:  614-443-4840
Fax:  614-573-2924
Email:  eric@eallenlaw.com

Attorney for Plaintiff Class

TABLE OF CONTENTS

Caption Page/ Title Page/ Cover Page ……………………………………………………………..1

Table of Contents……………………………………………………………………………...2

I.       Preliminary Statement……………………………………………………………...3

II.      Protective Control Housing in Ohio …………………………………………...5-11

III.     Jurisdiction………………………………………………………………………..11

IV.      Venue……………………………………………………………………………...11

V.       Parties to this Action ……………………………………………………...……..12-17

I.       Exhaustion of Available Remedies………………………………………...……..17

II.      Grievance System and Administrative Remedies Issues………………………...17-20

III.     Medical and Mental Health Related Issues……………………………………...20-27

IV.      Conditions of Confinement Issues……………………………………………...27-36

V.       Personal Safety Issues……………………………………………………………36-40

VI.      Vendors, Subcontractors, and Related Claims………………………….………40-42

VII.     Access to Courts and Related Issues……………………………………………43-46

VIII.    Parole Board and Related Issues…………………………………………………46-47

IX.      Visitation Related Issues…………………………………………………………48-49

X.       Exercise of Religion and Related Issues…………………………………………49-50

XI.      Classification and Security Level Issues………………………………………...50-52

XII.     Disciplinary Proceedings……………………………………………………...…52-53

XIII.    Searches, Seizures, and Privacy Issues…………………………………….......54-55

XIV.     Personal Property Claims………………………………………………………...55-56

XV.      Correspondence, Communication, and Publications…………………………...56-57

XVI.     Tobacco Products……………………………………………………………...…58-59

XVII.    Miscellaneous (Laundry Service, Mandatory Costs, etc.)………………………59-62

XVIII.   Relief Requested……………………………………………………………...…62-64

## I.     PRELIMINARY STATEMENT

1.      This is a Class Action brought under the Civil Rights Act of 1871; Title 42 U.S.C. §1983; the First, Furth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. This action seeks declaratory relief, injunctive relief, monetary relief for damages, and an order enjoining the Defendants, their agents, and those under their supervision from continuing to operate the Protective Control Unit (hereinafter PC) s so as to deny Plaintiffs (and the class and subclasses they represent) the rights guaranteed them under the Constitution and laws of the United States. The Plaintiffs seek this relief on the grounds that they are forced to undergo conditions of confinement that, taken singly and in totality, constitute cruel and unusual punishment.

2       The Defendants are wantonly, willfully, and deliberately denying essential medical care to many of the Plaintiffs, who form a subclass herein. Defendants are wantonly, willfully, and deliberately denying essential Psychiatric and Psychological care to Plaintiffs, who form another subclass herein. Defendants are wantonly, willfully, and deliberately failing to protect Plaintiffs from serious physical harm.

3.      Additionally, Defendant's decisions assigning security levels, as well Protective Control Classification, are arbitrary and capricious, pursuant to vague and overbroad criteria- without meaningful due process- resulting in confinement under conditions that, individually and totality, constitute significant and atypical hardship as compared with the ordinary incidents of prison life, and in some cases, extend the duration of incarceration.

4.      Defendants are aware of but indifferent to the serious consequences of long-term solitary confinement on inmates. Defendants are aware of but indifferent to the grave consequences of overcrowding under oppressive and dangerous conditions on inmates. Because PC prisoners

3

were in lock-down facilities, they were being subjected to unreasonably oppressive conditions that serviced no penological interest. PC prisoners had very little movement, programs, privileges, and access to the library/law library. In contrast, the movement and privileges afforded general population inmates of the same security levels, conditions within the PC units could only be deemed to amount to cruel and unusual punishment, in violation of the Eighth Amendment to the Constitution of the United States.

5.      In Ohio, a prisoner has two ways in which he may enter PC. The first way is upon entry into the prison system following conviction and sentencing, which is typically due to a high-profile criminal case. When a person enters Ohio's prison system, he is sent to either to Corrections Reception Center (hereinafter "CRC") or the Lorain Correctional Institution (hereinafter "LoCI"). These are intake facilities where all Ohio prisoners are first processed before being sent to the parent institution where they will serve their sentence. If a prisoner requires PC placement, he is immediately placed in the "hole" or punitive segregation. There he will spend months being systematically abused, malnourished, and deprived of even the most basic human needs. He is denied even the fundamental necessities that are provided the general population inmates in punitive segregation that surrounded him.  At LoCI, Ariel Castro [Plaintiff], was tortured so severely that he had to be transferred to CRC for his own safety, where he was soon found hanged to death.  The Plaintiffs who have been through CRC's segregation unit on their way to PC are convinced that Castro was murdered by CRC officials. Nevertheless, the ODRC investigators concluded otherwise. The second way an Ohio prisoner may enter PC is from the parent institution. This is typically the result of an investigation at the parent institution in which prison officials find that a prisoner is in imminent danger of serious physical harm from inmates in the general population. Just as is the practice at reception centers,

4

a prisoner requiring PC placement in an institution is put in that institution's "hole", or punitive segregation. They are also treated the same as those PC prisoners at the reception centers. It is common for these prisoners to spend up to a year in the hole while waiting to transfer to a PC unit. There are many instances where PC prisoners have waited in the hole for over a year-even up to and including 16 months.

6.      Protective Control Prisoners have suffered serious physical injuries, death, engaged in self-mutilation, attempted suicide, and successfully committed suicide due to these conditions. Numerous attempts have been made to request and demand of the Defendants that the conditions set forth herein be corrected. In the course of making said requests and demands, the Plaintiffs have exhausted all available administrative remedies. Pursuant to Federal Law, therefore, if the requested relief is not granted, the Defendants will continue to violate the rights of the Plaintiffs.

## II.      PROTECTIVE CONTROL HOUSING IN OHIO

7.      Protective Control is also commonly known as "protective custody" or "administrative segregation." Ohio Administrative Code Section 5120-9-14 governs Protective Control Housing within the Ohio Department of Rehabilitation and Correction (hereinafter "ODRC"). It states in that,

> "[t]he director or designee shall designate one or more institutions to maintain housing areas designated as protective control…[which] shall be used to house inmates that, due to personal safety concerns, need to be separated from the general inmate population." OAC § 5120-9-14(A).

8.      In order to comprehend systemic problems relative to Protective Control (hereinafter "PC"), a brief history is required.  On November 13, 2000, inmate Timothy Hancock (hereinafter "Hancock") murdered Jason Wagner (hereinafter "Wagner") while they were double celled together at WCI. It is reasonable to conclude that prison officials were liable for the death because Hancock has a history of violence. Wagner had no such history. Witnesses present prior

to the murder testified at Hancock's subsequent trial that Hancock has expressed anger that he was being forced to cell with a convicted child molester. Regardless, shortly after the murder, the PC units were transferred to the Southern Ohio Correctional Facility[1] (hereinafter "SOCF"), and later to the Toledo Correctional Institution[2] (hereinafter "ToCI").

9.      In the years since the murder in 2000, other factors have combined to render the PC units so crowded, oppressive, and dangerous that the instant action became the only viable option. One such factor is the growing number of violent, gardened gang members that have entered PC. See *Hamilton v. Eleby*, 341 Fed. Appx. 168, 2009 WL 2461107 (6th Cir. 2009). Hamilton was a member of the Aryan Brotherhood gang who had a "hit" (or threat) put on his life by his gang. He sought PC placement but was instead transferred to the WCI general population where he was attacked and seriously injured by members of the Aryan Brotherhood. The result of Hamilton's federal lawsuit (as relevant here) was that the ODRC was held liable for Hamilton's injuries because it was deemed unreasonable to transfer him to a different general population prison in lieu of placing him in a PC unit for his protection.

10.      Another factor is that prisoners with mental illnesses have gradually been placed in the PC units.  These inmates are ones that should not be housed in PC.

---

[1] SOCF is a maximum-security lock-down facility that is located in Lucasville, Ohio. As a result of the SOCF riot in 1996 and subsequent civil actions in federal court, a mandate issued requiring SOCF to be converted back into a single occupancy celled facility, and thereafter became a maximum security (security level 4) institution. When the PC prisoners were transferred to SOCF, they were housed in two separate blocks, each containing eighty single occupancy cells. One of those two blocks housed minimum and medium security (level 1 and 2) PC prisoners, while the other block housed closed security (level 3) PC prisoners. The level 3 block also housed PC prisoners under disciplinary control (level 4A and 4B, and LPH, punitive segregation, etc.).

[2] ToCI was designed as a supermax lock-down facility located in Toledo, Ohio. It was used primarily as a satellite facility to house the PC prisoners who had an institutional separation from SOCF (or a PC prisoner housed therein). ToCI housed level 1, 2, 3, and disciplinary control PC prisoners within the same block that contained forty-eight single occupancy cells. This housing arrangement at SOCF and at ToCI remained relatively consistent for well over a decade.

11      ODRC has implemented a small group of generic or otherwise less expensive medical and mental health medications (dubbed "formulary" medications within ODRC policies). Plaintiffs were taken off medications that were successfully treating their medical and mental health issues, and then forced to experiment with medications with the "formulary" group- often with disastrous results. Many have ultimately been taken of their medications altogether because the "formulary" medications were unsuccessful or resulted in side effects that were worse than the condition being treated. Many of the Plaintiffs are simply being denied any treatment for their medical or mental health issues. These Plaintiffs are left with the choice of using drugs that don't work or using no medications at all.

12.      Defendants have decided to  begin double celling PC prisoners again. In 2012, when the PC unites were transferred from SOCF to the Oakwood Correctional Facility (hereinafter "OCF"). OCF was a small single occupancy celled medical facility that was gradually converted to double occupancy use following the arrival of the PC prisoners in 2012

13.       OCF is a small facility, the ODRC decided it could now be managed and operated from the Allen Correctional Institution (hereinafter "ACI"), which is approximately a one-mile drive away from OCF. This encompassed medical, mental health, and food service facilities and personnel. The only prison officials that remained at OCF were corrections officers and their immediate supervisors. As a result, there are many well-documented instances were PC prisoners waited as long as 45 minutes for the appropriate medical personnel to arrive in response to an emergency. This placing the inmates lives in constant dangers. Because PC prisoners were being locked outside in a small fenced in area for "recreation" (without any supervision), there are well-documented instances where PC prisoners were literally throwing stones (or snowballs in the winter) at the second story windows in order to get the attention of other PC prisoners, so that

the units correctional officers could be summoned to open the door and be advised that one of the PC prisoners was down and needed immediate emergency assistance.

14.     The second floor PC units even housed a few prisoners who had elevator passes because of medical conditions precluded them from being able to walk up and down the stairs. Elevators are not to be used during a fire, those PC prisoners' lives were at continuous risk if there was a fire, as they would be physically unable to use the fire exit stairs. This became even more evident during the roughly six-month period that the elevator was out of service and being replaced, as the affected PC prisoners had to have staff bring their meals (and medications) to their cell. Grievances and other administrative remedy attempts were met with retaliation of all types. The Plaintiffs have sought assistance from numerous organizations including the ACLU and Governor Kasich's office.

15.     The deteriorating and debilitating conditions ultimately culminated in the escape of three PC prisoners from OCF on September 11, 2014. Because all three were high profile criminal cases (including Chardon High School shooter T.J. Lane), panic spread throughout the community of Lima, Ohio.  Shortly thereafter, much of the PC prisoners at OCF (whether security level 1 or 2) had their security increased to level 3 without due process, and were transferred to SOCF. After exiting the bus, they were advised by a SOCF Lieutenant that "central office doesn't care about you anymore so they sent you to us" even though the escapees were not in the group as they had been transferred to a supermax facility. PC was kept locked down at SOCF for an entire year before being sent to ToCI. While at SOCF, they were subjected to all manners of abuse, beginning with the destruction of much of their property by SOCF officials.

16.     PC was provided only the same minimal privileges as the level 4 general population prisoners who were at SOCF for disciplinary reasons. PC only received one hour out-of-cell

recreation per day, which was at 7:00 a.m. in the gymnasium. After several months, the yard was opened and PC was permitted outside for one hour per day. Several PC prisoners were allegedly severely beaten by SOCF officials, and there were some instances of PC prisoners being attacked by the general population inmates while guards stood by.  Additionally, about 20% of the PC prisoners were kicked out of PC without meaningful due process, and transferred to general population facilities throughout Ohio. PC prisoners' cells were constantly being tossed in a destructive and disrespected manner, and they were consistently harassed and abused during their stay at SOCF (from November 2014 through November 2015). And the conditions were not much better upon transfer to ToCI in November 2015, as the transferees did not receive any outside recreation or access to legal materials for over four months. This cased several PC prisoners to forfeit appeals in their criminal cases.

17.     This action also seeks an order that Defendants terminate (indefinitely) the double celling of PC prisoners. Further, Plaintiffs should no longer be housed with prisoners who have mental health issues or are under some form of disciplinary action due to their behavior. Plaintiffs assert that the time has come for subdivisions within PC so that violent prisoners are separated from those who are vulnerable. PC now houses violent predatory prisoners in addition to its vulnerable population. . As a result, those inmates in the vulnerable population are subjected to the very same intimidation, extortion, physical abuse, and sexual abuse as if they were back in the inmate general population. What is even more troubling here is that, not only have all the above been housed in the same PC block, but have even been forced to double cell together. Institutional Separations (per ODRC policy 53-CLS-05) have been denied when there is sufficient cause, and ignored when they already exist. On the rare occasion when Institutional Separations have been recognized, the two prisoners are still kept in the same block, and merely

let out of their cell at opposing times during the day. This procedure has not only failed and resulted in assault, but in essence punished an individual for having a separation.

18.       . This action seeks to correct the deplorable conditions of confinement that exist and/or have existed in PC. It seeks to end the deprivation of privileges for PC prisoners that are readily provided to general population inmates of equal security levels. And it intends to correct the inadequacies of the medical and mental health services provided to the Plaintiffs. Clearly the entire grievance procedure for said inadequacies fails by design and must undergo a complete transformation. This is because there is no one in the grievance process who has the license, education, or training to effectively access (or moreover reverse) a determination made by a doctor in regard to medical or mental health treatment.  The grievance procedure as proscribed by OAC § 5120-9-31 fails by design, at least as to these particular issues. As to all other grievance or appeal issues, the procedures in place fail by practice as direct result of Defendants deliberate indifference to the most basic human needs of the Plaintiffs, which is accomplished through retaliation, or the denial of relief for what are clearly meritorious claims.

19.       This action also seeks to correct fundamental constitutional violations underpinning the ODRC's parole authorities. This is especially evident for these Plaintiff's sentenced prior to Senate Bill 2 enacted in 1996 (otherwise known as "old law" prisoners). The procedures governing the Parole Board's determination as to whether or not to release Plaintiffs sentenced prior to Senate Bill 2 represent multiple due process violations that result in unreasonably long terms of incarceration. The disparity of sentences between prisoners sentenced prior to Senate Bill 2 and those sentenced after Senate Bill 2 shocks the conscious and clearly signifies fundamental defects that are inconsistent with rudimentary demands of fair procedure. Further, there is literally no meaningful appeals process in regard to decisions made by parole authorities.

20.     House Bill 86 (enacted in 2011) sought to correct some of the problems with old law prisoners, as well as growing problems due to overcrowding. However, it failed as none of the over 300 old law prisoners that were 65 years of age or older that House Bill 86 sought for release were ever released by the Parole Board. And the prison population in Ohio has continued to rise and is now well over 50,000[3].

## III.    JURISDICTION

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that this action arises under the Constitution and law of the United States, and pursuant to 28 U.S.C. § 1343 in that the Plaintiff Class seeks redress for civil rights violations under 42 U.S.C. § 1983. This Court has jurisdiction for claims seeking declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure. This Court has jurisdiction for claims seeking injunctive relief pursuant to 28 U.S.C. §§ 2283 and 2284, Rule 65 of the Federal Rules of Civil Procedure.

## IV.    VENUE

22.     Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b)(c) in that a substantial portion of the events or omissions giving rise to Plaintiff Class' claims occurred in this district, and a substantial portion of the administrative directives challenged in this action originated from the Ohio Department of Rehabilitation and Correction Operation Support Center, which is located in this district.

---

[3] The publication 'Against All Odds' (Volume XXI, pg. 5) states that "Ohio is currently operating at approximately 167% of combined design capacity." *The article also notes that ODRC "grossly" distorts such figures it releases, presumably to appear to be much closer to the 137.5% design capacity cap set forth by the Supreme Court of the United States in the most recent prisoner civil rights class action Brown v. Plata*, 563 U.S. 493, 131 S. Ct. 1910 (decided May 23, 2011). In that action, the Supreme Court ordered the California Department of Corrections to release tens of thousands of prisoners in order to reduce the prison population to 137.5% of design capacity. Under the oppressive conditions of confinement in Ohio PC units, it is contended that the cap should be much less. Regardless, may PC units have operated (and continue to operate) at nearly 200% of the design capacity.

## V.    PARTIES TO THIS ACTION

23.    The following individuals are class representatives of all prisoners held in Ohio's

Protective Control Units, who seek redress for the deprivation of rights secured under the

Constitution of the United States:

Acevedo, Elias (#651-901)          Anderson, Derrell (#647-750)

Arthur, Willie (#575-239)          Barney, Jerry (#591-734)

Briggs, Jay (#560-289)             Bishop, Jerry (#241-017)

Brookes, Ernest (#508-037)         Brown, Donald (#468-895)

Brown, Yusef (#322-338)            Burton, Shawn (#486-377)

Buck, Estelle (#485-675)           Bush, Dustin (#708-774)

Caldwell, Mike (#211-325)          Calvert, Jason (#650-191)

Camara, Robert (#476-763)          Castro, Ariel (Deceased)

Chaffins, Charles (#327-048)       Conn, Anthony (#699-225)

Cox, Michael (#440-129)            Davis, Levander (#656-768)

Davis, Savon (#577-547)            Diaz, Pedro (#507-960)

DiStasio, Phillip (#513-817)       Dunkle, Coy (#589-904)

Enyart, Richard (#569-505)         Fanti, Gary (#579-239)

Furguson, John (#507875)           Ferrara Jr., Michael (Deceased)

Fowler, Paul (#645-681)            Fowler, Raymond (#583-805)

Fulton, Thomas (#483-448)          Gay, Erik (#648-167)

Genco, William (#594-411)          Goff, John (#434-342)

Graff, Dane (#490-143)             Greathouse, Donald (#611-071)

Griffin, Reginald (#619-501)       Gross, Tony (#336-748)

Harris, Richard (#653-783)

Hicks, Joseph (#606-546)

Hooks, Joseph (#606-546)

Howland, John (#643-922)

Johnson, Shawn (#585-233)

Johnson, Willis (#605-768)

Kell, Donald (#602-387)

Kiser, Richard (#588-239)

Lanier, Antwon (#512-937)

Literal, Timothy (#567-509)

Mayhew, John (#527-277)

McGloughlin, David (#189-689)

Metcalf, Rick (#206-855)

Mills, Daniel (#535-145)

Morris, Kristoffer (#505-194)

Morris, William (#586-604)

M'Meara, Michael (#658-073)

Penton, David (#254-242)

Pine, Dale (#610-383)

Rice, Jamie (#609-174)

Robbins, Timothy (#306-582)

Roman, Fred (#542-189)

Ross, Samuel (#590-286)

Hendrickson, Jason (#676-070)

Hoffman, Matthew (#645-571)

Houston, Jimmy (#548-921)

Huffine, Joseph (#548-291)

Johnson, Thomas (#481-720)

Jorstad, John (#322-089)

Kessler, Delayan (#433-298)

Kraft, Paul (#516-966)

Lewis, Freddie (#443-298)

Mann, Earl (#369-329)

Maynard, David (#210-787)

Meredith, Marvin (#223-628)

Michael, Levi (#636-376)

Moore, Richard (#470-020)

Nelson, Rodney (#637-989)

Nunez, Victor (#637-989)

Palladeno, Ted (#665-479)

Phillips, Clayton (#670-173)

Profitt, Karl (#557-422)

Ringer, Charles (#666-563)

Rogers, Christopher (#469-636)

Roseberry, Nicholas (#696-455)

Satta, Barry (#412-920)

| | |
|---|---|
| Scott, Clyde (#367-252) | Scott, Raymond (#654-822) |
| Seay, Ernest (#615-170) | Sherman, Kinney (#315-380) |
| Shipley, Robert (#617-994) | Sinclair, Rick (#425-235) |
| Smith, Justin (#555-049) | Stamper, Gregory (Deceased) |
| Stidham, Kenneth (#598-516) | Teagarden, Trevor (#575-630) |
| Tharp, Randall (#557-772) | Thomson, Michael (#227-638) |
| Torok, Todd (#564-992) | Trent, Ronald (#505-443) |
| Turner, Rashon (#636-552) | Vititoe, Charles (#475-064) |
| Wagner, Scott (#455-592) | Westfall, Michael (#620-936) |
| White, John (#568-127) | Williams, Mike (#646-373) |
| Williams, Shawn (#625-985) | Witt, John (Released) |
| Wolverton, Ira (#410-595) | Wu, Chien-Tai (#568-570) |
| Young, Walter (Deceased) | |

24.     At all times relevant to this action, the Plaintiffs were incarcerated at one of the following institutions housing PC units (or a combination thereof), which are all managed and operated from the Ohio Department of Rehabilitation and Correction Operation Support Center, 770 West Broad Street., Columbus, Ohio 43222 (614) 752-1164.

Correctional Reception Center (CRC)
11271 State Route 762
Orient, Ohio 43146
Phone (614) 877-2441

Lorain Correctional Institution (LoCI)
2075 South Avon-Belden Road
Grafton, Ohio 44044
Phone (440) 748-1049

Oakwood Correctional Facility (OCF)
3200 North West Road
Lima, Ohio 45801
Phone (419) 225-8052

Southern Ohio Correctional Facility (SOCF)
1724 State Route 728
Lucasville, Ohio 45699
Phone (740) 259-5544

Toledo Correctional Institution (ToCI)
2001 East Central Avenue
Toledo, Ohio 43608
Phone (419) 726-7977

25.     Defendant Gary C. Mohr, at all times relevant to this action (unless specifically noted

otherwise), was the Director of the Ohio Department of Rehabilitation and Correction (ODRC),

located at the ODRC Support Center (also known as "central office"). He is legally responsible

for the overall operation of the ODRC and all institutions under its jurisdiction, including the

institutions that pertain to this action.

26.     Defendant Roger Wilson, at all times relevant to this action, was the Chief Inspector for

the ODRC, located at the ODRC Operation Support Center. He is responsible for the resolution

of grievances, administrative remedies, and the like.

27.     Defendant Dr. Robert Hammond, at all times relevant to this action, was the Chief of

Bureau of Medical Services for the ODRC, located at the ODRC Operation Support Center. He

is legally responsible for the medical health and well-being of prisoners that are incarcerated at

the ODRC.

28.     Defendant Dr. John DesMarais, at all times relevant to this action, was the Chief of the

Bureau of Mental Health Services for the ODRC, located at the ODRC Operation Support

Center. He is legally responsible for ensuring the mental health and well-being of prisoners

incarcerated in the ODRC.

29.     Defendant Brian Wittrup, at all times relevant to this action, was the Chief of the Bureau of Classification for the ODRC, located at the ODRC Operation Support Center. He is legally responsible for classification and transfer of all prisoners incarcerated in the ODRC.

30.     Defendant Cynthia Musser, at all times relevant to this action, was the Chairperson of the Parole Board for the ODRC, located at the ODRC Operation Support Center. She is legally responsible for the overall operation of the Parole Board and Adult Parole Authority.

31.     Defendant Ginny Lamneck, at all times relevant to this action, was the Warded at the Correctional Reception Center (CRC). She is legally responsible for the health, safety, and well-being of all prisoners under her supervision.

32.     Defendant Kimberly Clipper, at all times relevant to this action, was the Warden at Lorain Correctional Institution (LoCI). She is legally responsible for the health, safety, and well-being of prisoners under his supervision.

33.     Defendant Kevin Jones, at all times relevant to this action, was the Warden at the Oakwood Correctional Facility (OCF). He is legally responsible for the health, safety, and well-being of all prisoners under his supervision.

34.     Defendant Donald Morgan, at all times relevant to this action, was the Warden at the Southern Ohio Correctional Institution (SOCF). He is legally responsible for the health, safety, and well-being of prisoners under his supervision.

35.     Defendant John Coleman, at all times relevant to this action, was the Warden at Toledo Correctional Institution (ToCI). He is legally responsible for the health, safety, and well-being of prisoners under his supervision.

36.     Defendant Terry Collins, where specifically noted relative to this action, was the Director of the Ohio Department of Rehabilitation and Correction (ODRC), located at the ODRC

Operation Support Center. Where specifically noted herein, he was legally responsible for the overall operation of the ODRC and each institution under its jurisdiction, including the institutions affected in those relative portions of this action.

37.     John Doe 1 through John Doe 99, at all times relevant to this action, were agents of the Defendants listed above (or otherwise under their supervision), however their names are unknown but expected to be discovered throughout the course of this action.

38.     All of the Defendants listed above, at all times relevant to this action, were acting under color of state law and are being sued individually and in their official capacities.

39.     All of the Defendants listed above, at all times relevant to this action, caused, created, authorized, condoned, ratified, approved, or knowingly acquiesced or participated in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs, and practices that prevail in the Protective Control Units in Ohio. Defendants have therefore directly and proximately caused, and will continue to cause in the future, the damages, injuries, and violations of rights set forth herein.

## VI.     EXHAUSTION OF AVAILABLE REMEDIES

40.     Plaintiffs have exhausted all available administrative remedies before initiating this action.

## VII.     GRIEVANCE PROCEDURE FOR MEDICAL AND MENTAL HEALTH ISSUES

*COUNT 1: GRIEVANCE PROCEDURE FOR MEDICAL AND MENTAL HEALTH ISSUES*

41.     Plaintiffs state the inmate grievance procedure as proscribed by OAC § 5120-9-31, by design and practice, violates the Fourteenth Amendment- at least as it pertains to medical and mental health issues. The grievances challenge decisions made by physicians, and none of the three prison administrators who respond in the three steps of the grievance procedure are medical

17

professionals able to override or reverse a physician's clinical analysis or proposed treatment. As a result, all named Plaintiffs have suffered, and continue to suffer, from Defendants deliberate indifference to their serious medical and mental health needs.

*COUNT 2: GRIEVANCE PROCEDURE IS FRUSTRATED AND IMPEDED*

42.     Plaintiffs contend that the grievance procedure is deliberately being impeded and/or blocked as an ongoing practice in order to discourage or otherwise thwart efforts to utilize the grievance procedure, in violation of their due process rights under the Fourteenth Amendment. Grievance forms DRC 4088 and DRC 4146 are not available in the PC unites and must be requested from prison officials who refuse to provide said forms. For example, recently Plaintiffs Chaffins, Houston, Palladeno, Lewis, and Penton were all denied said forms from ToCI Institutional Inspector Brown.  Thus making it impossible to appeal these issues to the central office.

43.     After complaining to her supervisors, they were separately summoned to the Inspector's office and reprimanded (abusively), yet still denied said forms. On April 8, 2016, Palladeno complied his grievances on forms he created himself (using the official forms as a template), yet as of November 2016 he had received no response to any of the four grievances, despite multiple telephone calls to the appropriate Defendants at ToCI and ODRC Operation Support Center by his family in the interim. The same was experienced by Penton, and many other Plaintiffs similarly situated. Defendants are deliberately indifferent to Plaintiffs constitutional right to utilize the grievance procedure, which ultimately implicates all other constitutional rights.

*COUNT 3: RETALIATION FOR UTILIZING THE GRIEVANCE PROCEDURE*

44.     Plaintiffs assert that enough of their numbers have suffered injury as a direct and proximate result of retaliation for utilizing the grievance procedure that they fear for their health

and safety, causing them to refrain from filing grievances altogether. Plaintiffs Lewis, Roman, and Palladeno have consistently been harassed, abused, and neglected after complaining about various issues at ToCI. In fact, Plaintiff Lewis ultimately chose to sign out of PC and risk his safety in the inmate general population rather than continue to suffer the consequences levied against him for his grievance.

45.    Plaintiff Enyart filed grievances about forced double celling at OCF. His cellmate, with whom he was compatible, was moved out and a violent, mentally ill inmate was moved in on the same day. Countless efforts to inform Defendants to avoid imminent injury were ignored and Enyart was physically assaulted on two separate occasions before Enyart was finally moved in with someone else, who also consistently threatened abuse. The inmate who assaulted Enyart twice (Stallings) went on to assault his next two cellmates, Plaintiffs O'Meara, and Buck. These Plaintiffs, and others similarly situated, suffered violations for their Eighth and Fourteenth Amendment rights when they were retaliated against for asserting constitutionally protected rights within the ODRC grievance procedure as defined by OAC § 5120-9-31.

*COUNT 4: RETALIATION FOR PURSING INTERSTATE TRANSFER*

46.    Plaintiffs Arthur, Fowler P., Harris, Robbins, and Roman all have been retaliated against for pursuing an interstate transfer for their safety pursuant to ODRC Policy 53-CLS-07. For example, Plaintiff Arthur was denied even the right to initiate the proper paperwork to seek approval for an interstate transfer from the appropriate Defendants. His diligent efforts thereafter included pleas to the CIIC, ACLU, Ohio Attorney General, OJPC, and Governor Kasich, until finally he received a letter from Defendant Director Gary C. Mohr, which stated that it was recommended that you be considered for an out of state placement as part of the Interstate Corrections compact." However, Arthur was immediately placed in the hole.

47.    While in the hole for over three months, Arthur was treated the same as those general population inmates in punitive segregation that surrounded him, instead of receiving the privileges to which he was entitled due to his administrative segregation classification. Arthur was also systematically abused and intimidated during the three-month period, such that he decided he would rather risk his safety in Ohio rather than continue suffering the abuse. He was ultimately put back in the PC unit but only after promising to never mention interstate transfer again. These Plaintiffs, and others similarly situated, suffered violations of their Eighth and Fourteenth Amendment rights when they were retaliated against for asserting their constitutional right to be protected from serious physical harm. Further, said rights were again violated when Defendants failed to act reasonably in response to substantial risk of serious physical harm by denying an interstate transfer.

## VIII.   MEDICAL AND MENTAL HEALTH RELATED ISSUES

*COUNT 5: MEDICAL CARE DENIED OR OTHERWISE GROSSLY INADEQUATE*

48.    Plaintiffs contend that Defendants are deliberately indifferent to their serious medical needs, in violation of their Eighth and Fourteenth Amendment rights. All named Plaintiffs have suffered and many continue to suffer, from either the denial of medical care, or from medical care that is so grossly inadequate that it shocks the conscience.  Plaintiff Penton, has suffered for many years from many hive type sores that he likens to spider bites in appearance, which covers his entire body. Penton complains that the pain and itch is maddening, even to the point of rendering him sleep deprived and suicidal. SOCF and ToCI medical personnel have refused to provide any treatment at all, maintaining that "it is a psychological problem." When Penton sought mental health treatment, from the Defendants, he was told that there was nothing wrong with him., psychologically

49.     Plaintiff Nunez was seen on September 17, 2009 by Christopher Hood M.D., an Ophthalmologist at The Metro Health System. Dr. Hood recommended surgery, which has not occurred. Nunez has gradually lost his vision in his right eye, such that the surgery (which once would have fully restored his vision), may now restore only 20-30% of his vision. Denying Nunez of this surgery for over 7 years has also allowed the pressure in the eye to be reduced to the degree that there is now a risk that the retina could detach during the surgery. Furthermore, this continuing loss of pressure-left untreated- will ultimately cause Nunez to lose his eye altogether. Nunez's ongoing grievances occasionally result in a round trip to see a specialist, who always makes the same recommendation of treatment, which is never provided. The specialists also recommend that the medications Ultrim and Neurontin be provided until the surgery is performed, which the ODRC only intermittently provides.

50.     Plaintiff Palladeno has consistently been told by specialists outside of the ODRC that he must be provided a walking cane, the medications Nuerontin and Tramadol, as was the recommendation in a teleconference with an Ohio State University Neurologist on July 15, 2015. Palladeno suffers from Neuropathy, a condition affecting his L4 and L5 vertebrae, as well as his S1 nerve (all in his lower back area). The ODRC has treated his condition (on and off) for years, however ToCI refuses to provide the treatment recommended by the OSU Neurologist, which is (in general) the same treatment intermittently provided by the ODRC over the years. Without treatment, Palladeno's legs will periodically (and without warning) go numb and fail to support him. Palladeno has suffered very serious injuries on several occasions due to falls occurring as a direct and proximate result of the ODRC's failure to provide treatment for his serious medical need. The most recent fall was down a sixteen-riser metal tread stair on February 1, 2016, between 1:00-1:30 P.M. in Unit B-1 and 2 East. After several MRI's and a Cat scan, St.

21

Vincent's treated Palladeno by providing a cane, and the medication Lyrica. Upon returning to ToCI, both the medication and the use of the cane was discontinued.

51.    On October 13, 2016, Palladeno was sent on yet another round trip to see an outside specialist, this time it was to see Dr. Yusef, an Ohio State University Hospital Neurosurgeon. Palladeno explained that he had not been provided the treatment recommended in July, and Dr. Yusef expressed his frustration that the ODRC refuses to treat prisoners per their recommendations. He said that he is willing to provide a statement to the ODRC (statewide) only send inmates on round trips to specialists in order to appear to be attempting to provide treatment, but never actually provide treatment, or when they do, it is grossly inadequate and never in accordance with the specialist recommendation.

52.    It was these same medical conditions affecting Palladeno that caused Plaintiff Gregory Stamper to commit suicide after he was repeatedly refused treatment. All named Plaintiffs have suffered (and many continue to suffer) from violations of their Eighth and Fourteenth Amendment rights in regard to their medical care.

*COUNT 6: MEDICAL CARE MEDICATIONS CHANGED TO "FORMULARY"*

53.    Plaintiffs contend that the decision to discontinue medications that were successfully treating their medical needs and placing them on medications with a group of preapproved medications (dubbed "formulary" medications in ODRC policies) in order to reduce costs violates their Eighth and Fourteenth Amendment rights. Plaintiffs have been forced by the Defendants to experiment with preapproved "formulary" medications even when adverse and intolerable side effects resulted. Many of the name brand medications needs have no generic or "formulary" equivalent, nevertheless medications out of the formulary group were forced upon

the Plaintiffs as a cheaper alternative. Thus, Plaintiffs are left taking drugs that don't work or taking nothing at all.

53.     Additionally, an administrative approval process was implemented for all medications and treatments that are outside of the preapproved and "formulary" group. This means that the treating physicians at the various institutions are now required to submit a treatment request to ODRC Operations Support Center for approval before being able to treat Plaintiff's, which are often denied even though the administrators denying the request have not examined the Plaintiff and does not even have Plaintiff's medical file. The Eighth and Fourteenth Amendments are again violated because ODRC administrators are denying the treatments recommended by their own attending physicians.

*COUNT 7: OVER-THE-COUNTER MEDICATIONS DISCONTINUED*

54.     Plaintiff contend that the decision to discontinue over-the-counter medications violated their Eighth and Fourteenth Amendment rights. Over-the-counter medications such as Prilosec, Zyrtec, Ibuprofen, etc., were once prescribed to Plaintiffs seek treatment from ODRC medical personnel for conditions requiring said medications, they are told they must purchase it themselves from the prison's commissary. This practice constitutes deliberate indifference to Plaintiffs medical needs.

*COUNT 8: FORCED TO PAY FOR MEDICAL CARE*

55.     Plaintiffs assert that the new charge for medical care that is dubbed "co-pay" in ODRC policies violates their Eighth and Fourteenth Amendment rights. Further, the co-pay is assessed against the Plaintiffs whether treatment is ultimately provided or not (and is charged every time a follow up is needed for the same unresolved issue). Many of the Plaintiffs are precluded from

access to medical care simply because they are unable to afford the co-pay, which is assessed immediately upon a request of treatment. Most of the Plaintiffs are not able to pay anything.

*COUNT 9: CO-PAY ASSESSED UPON APPOINTMENT REQUEST*

56.     Plaintiffs contend that the practice of charging the co-pay for medical, optical, dental, or mental health care should not be assessed at the time that a request for an appointment is made. If the co-pay is ultimately deemed constitutional, then it certainly should not be assessed until the doctor or treating physician is actually seen, which is sometimes months (or years) after the initial request for treatment and assessment of co-pay. This is the same circumstances as any citizen in the community, who is not assessed a co-pay upon making an appointment to see a doctor, but instead makes the payment when services are rendered. Any other practice must be deemed in violation of Plaintiffs Eighth and Fourteenth Amendment rights.

*COUNT 10: MENTAL HEALTH CARE DENIED OR OTHERWISE GROSSLY INADEQUATE*

57.     Plaintiffs contend that Defendants are deliberately indifferent to their mental health care needs, in violation of the Eight and Fourteenth Amendments.

58.     Plaintiff Harris and Penton, were advised by ODRC medical personnel that their suffering was not due to medical issues, but mental health issues. However, ODRC mental health professionals have refused to provide treatment. These Plaintiffs, and other similarly situated, have suffered (and continue to suffer) from the denial of mental health care, or from mental health care that is grossly inadequate.

*COUNT 11: MENTAL HEALTH MEDICATIONS CHANGED TO "FORMULARY"*

59.     Plaintiffs contend that the decision to discontinue medications that were successfully treating their mental health care needs and placing them on medications within a small group of preapproved medications (dubbed "formulary" medications in ODRC policies) to save money

violates the Eighth and Fourteenth Amendments. Many of the medications, such as Seroquel, do not even have a generic or less expensive equivalent, thus Plaintiffs have been forced to experiment with alternative medications that are less effective, ineffective, or have intolerable side effects. Additionally, physicians at the institutions are now required to submit a request to ODRC Operation Support Center for approval before being able to prescribe medications or provide treatment that is outside of the preapproved "formulary" group. Rejecting a physician's determination on the appropriate treatment for administrative reason constitutes an additional violation of Plaintiffs constitutional rights.

*COUNT 12: FORCED TO PAY FOR MEDICAL CARE*

59.    Plaintiffs assert that the new charge for mental health care (dubbed "co-pay" in ODRC policies) violates the Eight and Fourteenth Amendments.  Further, the co-pay is assessed whether treatment is ultimately provided or not, and is charged every time a follow up is needed even if it is for ongoing analysis of the same unresolved issue.  Many of the Plaintiffs are precluded from access to mental health care because they are unable to afford the co-pay, which is assessed upon a request for an appointment, instead of at the time of the appointment.

*COUNT 13: DENTAL CARE DENIED OR OTHERWISE GROSSLY INADEQUATE*

60.    Plaintiffs contend that Defendants are deliberately indifferent to their dental care needs, in violation of their Eighth and Fourteenth Amendments.

61.     Plaintiff Enyart, for example, has paperwork advising that he was told in January 2011 and February 2012 that he was "on the list" to see the dentist to being the treatment plan that was decided in 2009, however he has still not had any further dental care whatsoever.

62.    Plaintiff Smith, as another example, was ultimately released without receiving the dental care he was consistently told he was "on the list" to review. These Plaintiffs, and others similarly

situated, have suffered (and continue to suffer) from the denial of dental care, or dental care that is otherwise grossly inadequate.

*COUNT 14: DENTURES, PARTIALS, IMPLANTS, AND CROWNS DENIED*

63.    Plaintiffs are being denied dentures, partials, implants, crowns, and even fillings for cavities, in violation of the Eighth and Fourteenth Amendments. Instead of repairing a tooth with a filling or crown, the ODRC practice is to remove the tooth. Plaintiffs are told that any other option is deemed "cosmetic" and the ODRC does not pay for "cosmetic" work.

64.     Plaintiffs Brooks, Buck, Caldwell, Enyart, Ferguson, and Smith, for example, are unable to eat properly due to the refusal of partials and other like needs. As such, their remaining teeth have shifted and loosened because their bite is now misaligned. These Plaintiffs, and others similarly situated, have suffered (and continue to suffer) from Defendants deliberate indifference to their dental care needs.

*COUNT 15: FORCED TO PAY FOR DENTAL CARE*

65.    Plaintiffs assert that the new charge for dental care (dubbed "co-pay" from some ODRC officials-although ODRC policies apparently do not allow it) violates the Eighth and Fourteenth Amendments. Also, the copay assessed at the time that the request for dental care is made, even though the actual appointment many not occur for months or even years later. The co-pay is assessed whether treatment is provided or not, and is assessed for each follow up even if it pertains to the same ongoing unresolved issue. Many of the Plaintiffs are precluded from access to dental care because they are unable to afford the co-pay.

*COUNT 16: OPTICAL CARE DENIED OR OTHERWISE GROSSLY INADEQUATE*

66.    Plaintiffs contend that Defendants are deliberately indifferent to their optical needs, in violation of the Eighth and Fourteenth Amendments.

67.    Plaintiff Stidham, for example, was told he had glaucoma by ODRC personnel, but that there was no treatment. Stidham discovered, and asserted in his grievances, that not only was glaucoma treatable, but that "[w]ithout treatment, glaucoma can cause blindness." Stidham has never been treated.

68.    Plaintiff Enyart, as another example, has paperwork dated March 5, 2012 advising that he would be added "to the list to see the eye doctor for an exam" in response to his assertion that his current eyeglasses were over four years old and ineffective. He was not seen by the eye doctor until over 3 years later. These Plaintiffs, and other similarly situated, have suffered (and some continue to suffer) from the denial of optical care or from optical care that is grossly inadequate.

*COUNT 17: FORCED TO PAY FOR OPTICAL CARE*

69.    Plaintiffs assert that the new charge for optical care (dubbed "co-pay" from some ODRC officials-although ODRC policies apparently do not allow it) violates the Eighth and Fourteenth Amendments. Further, the co-pay is assessed at the time the request for the appointment was made, even though the appointment may not occur for months or even years later. The co-pay is assessed whether any treatment is provided or not, and is also assessed for each follow up even if it pertains to the same ongoing or unresolved issue. Many of the Plaintiffs are precluded from access to optical care because they are unable to afford the co-pay then they do not see the Doctor.

## IX.    CONDITIONS AND CONFINEMENT ISSUES

*COUNT 18: OCF IS NOT DESIGNED FOR DOUBLE OCCUPANCY CELLS*

70.    Plaintiffs contend that the conversion of single occupancy cells at OCF to double occupancy cells violates the Eighth and Fourteenth amendments. See *Inmates v. Rufo*, 12 F.3d 286, 293-94 (1st Cir. 1993). OCF was not only designed (and used until recently) as a medical

27

facility for ODRC prisoners suffering from serious medical and mental health illnesses. As such, there are very little common areas or areas in which prisoners may move about outside of their cell, because the patients/prisoners for which OCF was designed would have been unable to utilize such areas. Defendants are aware of, but deliberately indifferent to, the unconstitutional conditions of confinement that were created by the conversions of OCF to double occupancy use. OCF PC units currently operates at nearly 200% of the design capacity. See *Brown v. Plata,* 563 U.S. 493, 131 S.Ct. 1910 (2011), in which the Supreme Court of the United States held that overcrowding that exceeded 137.5% design capacity was unconstitutional. This facility should not have been used in the past and should not be used in the future where inmates are doubled celled.

*COUNT 19: ToCI NOT DESIGNED FOR DOUBLE OCCUPANCY CELLS*

71.     Plaintiffs contend that the conversion of single occupancy cells at ToCI to double occupancy violates the Eighth and Fourteenth Amendments. See *Inmates v. Rufo,* supra. ToCI was designed as a single occupancy celled "supermax" prison and began operations in the year 2000. Because supermax prisoners are locked down 23 hours a day, there are very little "common" areas (areas where prisoners may have movement outside of their cells). As such, the decision to double cell lower security level PC prisoners in a facility designed for single cell supermax security is in clear violation of the constitution. Plaintiffs were advised by ToCI prison officials in January 2016 that they "need to pick a cellmate, or one will be chosen for you." Many of the cells already contain two PC prisoners and a second bunk has been installed in all cells. Defendants are aware of, but deliberately indifferent to, the unconstiutuional conditions of confinement that are created by the conversion of ToCI PC units to double occupancy use. Plaintiffs have filed for preliminary injunction.

Around the same time, ToCI was also being converted to double occupancy use, although it had been designed as a single occupancy celled supermax facility. The conversion of these two prisons housing PC prisoners from single occupancy cells to double occupancy use created overcrowding that, combined with the oppressive and dangerous conditions described above, created an environment that was both deplorable and inhumane.

Corrections officers picketed the dangerous and deplorable conditions at ToCI, which had not been seen shortly before the 1996 riot at SOCF. The statistical data of inmate-on-staff and inmate-on-inmate violence skyrocketed, which only reflected the incidents that were not able to be covered up. There were more deaths at ToCI within this period that at all other prisons in Ohio combined. An inspection at ToCI by the Correctional Institution Inspection Committee (hereinafter "CIIC") resulted in a 164-page report that CIIC called its "most scathing report in CIIC history." Conditions became so unsafe that five Toledo City Council Members filed a formal request with Governor Kasich to order the ODRC to return ToCI to single occupancy cells. However, double bunks still remain in every cell to this day and ToCI has begun double celling again in the PC units.

*COUNT 20: DOUBLE CELLING IN PC UNITS*

72.    Plaintiffs contend that the double celling of PC prisoners, no matter what instiutuon contains the PC units, is in violation of the Eighth and Fourteenth Amendments. This is due to a combination of the safety requirements of PC prisoners in general, as well as the restrictive and oppressive conditions inherent to any and all PC environments. See *Balla v. Idaho State Board of Corrections,* 595 F. Supp. 1558, 1575 (D. Idaho 1984); and *Nami v. Fauver*, 82 F.3d 63, 65-68 (3rd Cir. 1996). This is especially apt in Ohio's PC units, which unconstitutionally mixes violent, gang members, mentally ill, homosexuals, vulnerable, sexually aggressive, multiple security

levels, and those under disciplinary action. See *Little v. Walker*, 522 F.2d 193, 195-97 (7th Cir. 1977); *Inmates v. Barry*, 717 F. Supp. 845, 868 (DDC 1989); *Miller v. Shelby County*, 93 F. Supp.2d 892, 899-900 (WD Tenn. 2000); and *Janes v. Hernandez*, 215 F.3d 541, 542-543 (5th Cir. 2000). Further, these incompatible types are often forced to double cell together resulting in physical and sexual abuse, extortion, theft, and mental health disorders. Defendants are aware of, but are deliberately indifferent to, the constitutional violations resulting from the double celling of PC prisoners.

*COUNT 21: HOUSING VIOLENT WITH VULNERABLE IN PC UNITS*

73.    Plaintiffs contend that the failure to separate the violent from the vulnerable within the PC units violates the Eighth and Fourteenth Amendments. Plaintiffs who are meek or otherwise vulnerable to intimidation, extortion, physical assault, and sexual assault are now being housed in PC units that also house the violent, hardened, and aggressive types from which they sought PC protection. Further, these incompatible types are often forced to double cell together. These practices are unconstiutuional. See *Little v. Walker*, supra; *Miller v. Shelby County,* supra; and *Butler v. Dowd*, 979 F.2d 661, 675 (8th Cir. 1992). Plaintiffs contend that there must be a subdivision of PC units in order to separate the various groups, as many have suffered (and some continue to suffer) serious injury in the PC units from those who display the same characteristics as those who preyed upon them in the inmate general population. Defendants are aware of, but deliberately indifferent to, these unconstiutuional conditions of confinement.

*COUNT 22: HOUSING PUNITIVE SEGREGATION WITH ADMINISTRATIVE SEGREGATION*

74.    Plaintiffs contend that the failure to separate PC prisoners who are under disciplinary action for their behavior from others in the PC unit violates the Eighth and Fourteenth Amendments. Defendants have housed (and continue to house) together PC prisoners with those

who are being disciplined, such as those in the hole (punitive segregation), security levels 4A and 4B, LAP (Limited Activities Program), LPH (Limited Privileges Housing). Defendants even house the different classifications in the same cell, with disastrous and possible injurious results. It is well settled that punitive segregation prisoners are not be house with administrative segregation prisoners. See *Inmates v. Barry,* supra; *Little v. Walker,* supra; and *Tillery v. Owens,* 719 F.Supp. 1271, 1276 (WD Pa. 1989). Defendants are aware of, but deliberately indifferent to, these unconstiutuional conditions of confinement.

*COUNT 23: HOUSING THOSE WITH MENTAL HEALTH ISSUES IN PC UNITS*

75.     Plaintiffs contend that the failure to separate PC prisoners who have mental illnesses from those who do not violate the Eighth and Fourteenth Amendments. Defendants have housed, and continue to house, the two different groups within the PC units, and even within the same cell. It is well settled that this practice violates rights of both groups. See *Langley v. Coughlin,* 715 F. Supp. 522, 543 (SD NY 1988); *Thaddeus-X v. Blatter*, 175 F.3d 378, 403 (6th Cir. 1999); and *DeMallory v. Cullen*, 855 F.2d 442, 444 (7th Cir. 1998). Defendants are aware of, but deliberately indifferent to, the unconstitutional conditions of confinement resulting from housing prisoners with mental health issues in the PC units.

*COUNT 24: HOUSING DIFFERENT SECURITY LEVELS IN PC UNITS*

76.     Plaintiffs contend that housing different security levels in the same PC units (and the same cells) violates the Eighth and Fourteenth Amendments. See *Janes v. Hernandez,* supra; and *Butler v. Dowd,* supra. Defendants have housed together (in the same PC units and the same cells) the following security levels; security level 1 (minimum security), security level 2 (medium security), security level 3 (closed security), and security levels 4A, 4T, and 4B (maximum security). This practice is in clear violation of Plaintiffs constitutional rights.

Defendants are aware of, but deliberately indifferent to, the unconstitutional conditions of confinement that result from housing different security levels together in the same PC units. Plaintiffs suffered (and continue to suffer) serious harm from these practices.

*COUNT 25: PRACTICES AT CRC, LoCI, AND OTHER PRISONS PENDING TRANSFER*

77.     Plaintiffs contend that placing them in punitive segregation at the reception centers (CRC and LoCI) and at other institutions pending transfer to a PC unit violates the Eighth and Fourteenth Amendments. Additionally, while waiting for said transfer, Plaintiffs have suffered every conceivable manner of abuse. These include: deprivation of heat in the winter, bedding, clothing, shower, recreation, toothbrush/toothpaste, toilet paper, medical care, dental care, mental health care. Plaintiffs are also very malnourished. Meals are often dumped on the floor (when provided) or packed into a "meal loaf." Plaintiffs are systematically abused to the point of attempting suicide, committing self-mutilation, and even committing suicide. Further, these conditions continue for many months, and often exceed a year-for example- Plaintiff Smith spent 16 months in the hole being abused while awaiting transfer to a PC unit.

*COUNT 26: PC PRISONERS DEPRIVED OF PRIVILEGES, PROGRAMS, & MOVEMENT*

78.     Plaintiffs contend that the lack of programs, movement, recreation, jobs, religious services, access to library and law library, family visitation, and general privileges afforded general population inmates violates the Eighth and Fourteenth Amendments. This is so because the excessively restrictive and oppressive conditions of confinement in the PC units serve no safety or other penological interest. Said conditions create an atypical and undue hardship on Plaintiffs as compared with the ordinary incidents of prison life. Defendants are aware of, but deliberately indifferent to, these deprivations unjustifiably suffered by all Plaintiffs housed in the PC units.

*COUNT 27: OUTDOOR RECREATION DENIED AND/OR UNNECESSARILY LIMITED*

79.     Plaintiffs contend that the lack of outdoor recreation and/or the excessively limited outdoor recreation (when provided) violates the Eighth and Fourteenth Amendments. Currently Plaintiffs at ToCI only receive one hour in the recreation yard per day, which followed a four-month period in late 2015/early 2016 where they received no outdoor recreation whatsoever. Plaintiffs at OCF have suffered many four and six-month periods without outdoor recreation even though the general population inmates housed at OCF had unlimited access to the recreation yard every day. During the years that OCF housed security level 4 PC prisoners, they never received any outside recreation. Defendants are therefore aware of, but deliberately indifferent to, the significant and atypical hardship created by the lack of outdoor recreation, or outdoor recreation that is unjustifiably minimal in frequency and/or duration.

*COUNT 28: PC LOCKED DOWN OFTEN AND FOR LONG PERIODS OF TIME*

80.     Plaintiffs contend that the long periods where they are locked down without a reasonable penological interest violates the Eighth and Fourteenth Amendments. Records will show that at OCF, Plaintiffs were locked down so often that their constitutional rights were implicated. In fact, following the escape of three prisoners from the OCF PC units, the Plaintiffs that were transferred to SOCF were locked down for an entire year in 2015. This constitutes mass punishment and the unreasonably long period lock down created a significant and atypical hardship. Often the lock downs at OCF eliminated all out of cell activities, including meals, where were cold "brown bag" meals brought to the Plaintiffs cells. Defendants are aware of, but deliberately to, these constitutional conditions of confinement.

33

*COUNT 29: ONGOING HARASSMENT AND ABUSE OF PC PRISONERS*

81.     Plaintiffs contend that ongoing practice of harassing and abusing PC prisoners violates the Eighth and Fourteenth Amendments. Defendants are aware of, but deliberately indifferent to, the abuse continually suffered by all PC prisoners, thereby perpetuating these unconstitutional violations, some examples of which follows.

82.     Plaintiff Penton and his family sought all manner of remedies to the third shift block officer at ToCI from the inhumane abuse that was experienced by all PC prisoners in his unit. Said officer woke Penton and most often (everyone else) throughout the night purposefully and with malicious intent. Said officer threatened to kill Penton on several occasions-all completely unprovoked and solely because of why he was in PC. At OCF, the windows of all PC prisoners were welded shut, but not those of the general population. Practices such as these permeate into the day to day conditions affecting every aspect of a PC prisoner's life.

83.     At ToCI, prisoners are deprived sleep due to activities occurring during the night. Toilet paper is passed out after midnight, which involves opening and slamming the small metal trap doors within each cell door, waking everyone in the PC unit. Officers use flashlights when doing rounds (which occur twice per hour) and shine the light into the cell, which temporarily blinds the PC prisoners. Medications have been passed out at 4:30 A.M. through the metal trap doors located in the cell doors. Blood draws for blood tests are routinely done at 5:30 A.M., as urine collections for drug testing. These practices are but a few that represent general methods of harassment, which are punctuated by random acts of verbal and physical abuse. In general population units, all practices (medication and toilet paper distribution, blood draws, etc.) are done during normal daytime hours.

34

*COUNT 30: NO FIRE ESCAPE FOR PC PRISONERS AT OCF WITH DISABILITIES*

84.     Plaintiffs contend that the PC prisoners with elevator passes (because they have physical disabilities that render them unable to use the stairs) have no means to exit the structure if there was a fire, which violates not only the Eighth and Fourteenth Amendments, but also the Americans with Disabilities Act.  This is so because the affected Plaintiffs (Buck, Metcalf, Palladeno, and others similarly situated) were required to have medications and meals brought to their cells during the roughly six-month period when the elevator was being replaced. Clearly if they were unable to walk down the steps from the second floor to get medication and meals, then they would also be unable to use the fire exit stairs in a fire. Further, these Plaintiffs were precluded from going to the library, law library, visiting room, recreation, etc., during this time period because all are located on the first floor. Regardless, grievances were filed specifically advising Defendants of the risk of death if there were a fire, however no measures were taken to abate the risk.

*COUNT 31: EXCESSIVE NOISE IN ToCI DAYROOM/COMMON AREA*

85.     Plaintiffs contend that the excessive noise that exists in the dayroom/common area at ToCI PC units violates the Eighth and Fourteenth Amendments because it "inflicts pain without penological justification[.]" *Toussaint v. McCarthy,* 801 F.2d 1080, 1110 (9th Cir. 1986). See also *Jones v. San Franscico*, 976 F.Supp. 896, 915 (ND Cal. 1997), holding that noise ranging from 73 to 96 decibels was unconstitutional. Because ToCI was designed as a supermax facility in which prisoners would be locked down 23 hours a day, there was no need for a "dayroom" (or common area)Because ToCI was designed as a supermax facility in which prisoners would be locked down 23 hours a day, there was no need for a "dayroom" (or common area) where prisoners could spend time outside of their cell. When converting the 48 cell units for PC use, the

"hall" space between the cells was converted to a "dayroom." This is a two-story concrete and metal hall that echoes and magnifies noise in excess of constitutional limitations, because no consideration was taken in the design of the space to include baffles, mufflers, sounds attenuation devices, and the like. Plaintiffs contend that the failure to install such devices when converting the hall to a dayroom violated their constitutional rights.

*COUNT 32: CLEARANCE BETWEEN TOP AND BOTTOM BUNKS AT ToCI*

86.    Plaintiffs contend that the top bunk has been installed too close to the bottom bunk in the PC units at ToCI, such that Plaintiffs in the bottom bunks are suffering from ongoing head injuries, in violation of the Eighth and Fourteenth Amendments. It is clear upon an inspection of the second bunks recently added to each cell that they have been installed haphazardly as none maintain the same clearance. None have the clearance to allow the prisoner on the bottom bunk to sit upright, resulting in ongoing head injuries, as well as the occasional traumatic brain injury.

*COUNT 33: DRAWER ATTACHED TO BOTTOM BUNK AT ToCI CAUSES FOOT INJURY*

87.     Plaintiffs contend that the metal drawer attached to the underside of the bottom bunks in the PC units at ToCI have a sharp edge, resulting in ongoing lacerations and trauma to their feet. The Defendants are aware of, but deliberately indifferent to, the many injuries suffered from the various deficiencies within each cell in the PC units at ToCI.

## X.    PERSONAL SAFETY ISSUES

*COUNT 34: FAILURE TO PROTECT PC PRISONERS FROM HARM*

88.    Plaintiffs assert that all of them have suffered (and many continue to suffer) from Defendants' failure to protect them from serious physical harm, in violation of the Eighth and Fourteenth Amendments. As the Supreme Court of the United States explains, prison officials "will be liable under the Eight Amendment for failing to protect an inmate[.]" *Farmer v.*

*Brennan,* 511 U.S. 825, 828,834 (1994). Liability is established when a prison official "knows of a substantial risk of serious physical harm … [but] disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 842-43. Prison Officials "are not free to ignore obvious dangers" to inmates, even if they do not know "the exact nature of harm that may befall a particular inmate." *Farmer*, 511 U.S. at 843-44. The trier of fact "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

89.    In the instant action, all named Plaintiffs (and others similarly situated) suffered harm from Defendants' failure to respond reasonably to obvious risks of harm. For example, Plaintiffs Buck, Caldwell, Enyart, Fowler R., Norris, O'Meara, Teagarden, and Tharp all provided specific notice if impending and imminent harm, however the Defendants did not take any measures whatsoever to abate the risk of harm, and harm occurred.  Plaintiffs Brown D., Fowler P., Roman, Roseberry, and Ross all provided specific notice of gang related impending harm while in the inmate general population. They were then properly isolated from the general population while the gang related risk of harm was investigated. However, Defendants failed to place them in PC, and instead determined that transferring them to a different institution would abate the risk of harm. Shortly after the transfer, they were attacked by the gang that was the subject of the risk of harm, just as in the case *Hamilton v. Eleby*, 341 Fed.Appx. 168 (6th Cir. 2009), which held that transfer in lieu of PC placement under these circumstances was unreasonable and prison officials were liable.

90.    Another example included Plaintiffs Brookes, Calvert, Ferrara, and Harris, who were all attacked by general population inmates after being placed in PC. This was a direct result of Defendants' failure to keep general population inmates separated from PC prisoners. Defendants

also consistently fail to keep PC inmates separated who have had institutional separations ordered pursuant to ODRC Policy 53-CLS-05, which has resulted in harm to Plaintiffs Arthur, Brown Y., Maynard, Vititoe, and Witt. Furthermore, Plaintiffs Fowler P., Hook, Literal, Shipley, and Williams M. were all victims of gang "hits" after being placed in PC to be protected from the gang that carried out the hit in PC. And Plaintiffs Barney, DiStasio, Enyart, Goff, Hendrickson, Kraft, Mills, Nelson, Nunez, Phillips, Sinclair, Turner, and Young were all harmed in PC by other inmates as a direct and proximate result of the Defendants' failure to protect them from an obvious risk of harm.

*COUNT 35: FORCED OUT OF PC DESPITE ONGOING RISK OF HARM*

91.     Plaintiffs contend that they are being forced out of PC and transferred to general population institutions despite the fact that a substantial risk of serious physical harm remains, in violations of the Eighth and Fourteenth Amendments. Plaintiffs Dunkle, Genco, Hook, Kiser, Mann, Mayhew, Michael, Rice, Rogers, Scott C., Teagarden, Thomson, Vititoe, Wagner, White, and Wu were all forced out of PC and placed in the inmate general population despite the fact that the need for protection <u>continues to exist</u>. See *Hewitt v. Helms*, 459 U.S. 460, 477 (1983), *holding that administrative segregation is protective in nature, and shall continue as long as the reason for it continues to exist.*

*COUNT 36: SEPARATIONS DENIED DESPITE SUFFICIENT CAUSE*

92.     Plaintiffs contend that they are being denied separations from other inmates under ODRC Policy 53-CLS-05 despite sufficient cause, in violation of the Eighth and Fourteenth amendments. Plaintiffs Arthur, Caldwell, DiStasio, Enyart, Fowler P., Fowler R., Goff, Jorstad, Kraft, Mann, Maynard, Profitt, Tharp, and Wagner were all denied institutional separations between themselves and other inmates who have physically or sexually assaulted them.

Defendants are aware of, but deliberately indifferent to, the substantial risk of serious harm that exists when denying separations despite sufficient cause.

*COUNT 37: PC NOT SEPARATED FROM GENERAL POPULATION INMATES*

93.     Plaintiffs contend that they are not properly separated from general population inmates, in violation of the Eighth and Fourteenth Amendments. Plaintiffs are never separated from general population inmates during family visitation. Plaintiffs are often placed in the same unsupervised holding rooms with general population inmates. During movement of PC to the cafeteria, recreation, etc., Plaintiffs have documented countless incidents over the years where they have been needlessly exposed to general population inmates, often resulting in harm. Most recently at ToCI (on March 30, 2016 at approximately 2:15 P.M.), Plaintiff Harris was attacked by a general population inmate while he was on his way back from outside recreation.  The attacker was a member of a gang who has a "hit" placed on Harris, the incident is well documented, and includes security camera footage.

*COUNT 38: GENERAL POPULATION INMATES PREPARE PC MEALS*

94.     Plaintiffs contend that the practice of allowing general population inmates to prepare their food violates the Eighth and Fourteenth Amendments. This is most easily evidenced by the many well documented incidents where PC prisoners have had their food tampered with by the general population inmates, finding such items as feces, semen, mucus, glass, rocks, fingers from rubber gloves ("prison condoms"). Further, there have been specific threats against specific PC prisoners carved into the plastic trays that contain their food. A recent tampering incident resulted in food poisoning of both of the PC units at ToCI, which occurred on December 28, 2015. Both PC units were locked down under quarantine for several days.  More recently on July 1, 2016, Plaintiff Calvert found semen in the drink container, which was witnessed by the B-

1&2-E camera, as well as the block officers. In response to complaints about the most recent incidents, Plaintiff were forced to go to the cafeteria to retrieve their meals, which has previously been brought to the PC units, thus eliminating any possibility that the general population inmates preparing the food are unaware of who is actually receiving the food.

## XI. VENDORS, SUBCONTRACTORS, AND RELATED CLAIMS

### COUNT 39: FINES AGAINST ARAMARK KEPT BY THE ODRC

95      . Plaintiffs contend that the fines levied against the food service contractor Aramark were kept by the ODRC instead of being divided among the prisoners who actually suffered from Aramark's contract defaults, in violation of said prisoner's Eighth and Fourteenth Amendment rights. On two different occasions in 2014, for example, Aramark was fined $130,200.00 and $142,1400.00 for "contract violations" due to "infestations of maggots" and other issues such as "inadequate meal portions." (See Prison Legal News, December 2015 issues, Vol. 26, No. 12, article titled "Aramark's Correctional Food Services: Meals, Maggots, and Misconduct."). The situation benefits the ODRC, who has a fixed contract with Aramark. Thus, when Aramark provides "inadequate meal portions" the ODRC benefits by reducing its contract amount through fines, and only the prisoners suffer, as they are not being provided adequate meals. (See Against All Odds, Vol 21, No. 4, pg. 5, citing that Aramark's "contract can reduce the cost for a meal from $1.58 per meal to $1.19, saving [the] ORC an estimated $79 million per year.").

### COUNT 40: ARAMARK MEAL PORTIONS INADEQUATE

96.      Plaintiffs contend that the meal portions provided by Defendant's contractor Aramark are inadequate, in violation of the Eighth and Fourteenth Amendments. Aramark meals that are actually provided to PC prisoners are grossly inadequate, and are rarely provided in the portions proffered in the menu.  Defendants are aware of, but deliberately indifferent to, the inadequate

meal portions provided by their contractor Aramark. See *Ramos v. Lamm*, 639 F.2d 559, 570 (10th Cir. 1980).

*COUNT 41: ARAMARK NOT PROVIDING SPECIAL DIET MEALS TO PC*

97.     Plaintiffs contend that they are not receiving the meals that meet their special diet needs, in violation of the Eight and Fourteenth Amendments. These include special diets required for medical reasons, *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994); as well as religious meals, see *Ford v. McGinnis*, 352 F.3d 582, 597 (2nd Cir. 2003). Plaintiffs Acevedo, Bishop, and many other have diabetes, yet are provided the same meal as everyone else. The same is true for Plaintiff Sinclair, who requires gluten free food. Plaintiff Chaffins is being denied religious meals. These Plaintiffs, and others similarly situated, have made the appropriate Defendants aware that they were approved and/or ordered special meals for their special needs, however Defendants have acted (and continue to act) in deliberate indifference to their needs.

*COUNT 42: ARAMARK NOT PROVIDING DIABETIC SNACK PACKS*

98.     Plaintiffs contend that the diabetics among them (such as Acevedo, Bishop, and others) are not being provided their snack packs that enable them to eat between meals when their sugar levels are compromised, in violation of the Eighth and Fourteenth Amendments. See *Lolli v. County of Orange*, 351 F.3d 410, 420-21 (9th Cir. 2003), holding that "[d]iabetes is a common yet serious illness that can produce harmful consequences if left untreated for even a relatively short period of time." As a result of Defendants deliberate indifference to Plaintiffs' special need ordered by the appropriate medical personnel, Bishop's sugar level during these periods, for example have tested between 350 and 600, which is life threatening. In fact, Bishop has had five heart attacks and one stroke.

*COUNT 43: GTL OVERCHARGED FOR PHONE SERVICE UNTIL 2015*

99.     Plaintiffs contend that the excessive fees they were charged until 2015 by the ODRC's telephone service provider Global Tel Link (hereinafter "GTL") was in violation of the Eight and Fourteenth Amendments. Plaintiffs Arthur, Enyart, Tharp, and Wagner, for example paid over $20.00 for 15-minute interstate calls prior to the rate change in 2015, which now costs just a little over $1.00 for the same 15-minute call. An interstate call prior to 2015 cost $1.04 surcharge plus $.32 per minute plus 14.4% federal universal charge. An interstate call prior to 2015 cost $3.90 surcharge plus $.87 per minute plus 14.4% federal universal charge. Following the rate change in 2015, all of these calls range in price from $.75 to $1.25 for a 15-minute call. Defendants were aware of, but deliberately indifferent to, the excessive fees being charged Plaintiffs for telephone calls prior to 2015.

*COUNT 44: OTHER VENDORS SUCH AS ACCESS AND J-PAY OVERCHARGE*

100.    Plaintiffs contend that other vendors who supply goods and services to them (including, but not limited to, Access Secure Pak and J-Pay) are overcharging for items that can be obtained at retail stores for a fraction of the cost charged to Plaintiffs, in violation of the Eighth and Fourteenth Amendments. The ODRC only permits Plaintiffs to order goods and services from a small group of vendors, dubbed "approved vendors" in ODRC regulations. Often these vendors have no competition whatsoever on some of the goods and services, implicating monopoly laws, as can easily be evidenced by the excessive costs charged for everyday items. Defendants are aware of, but deliberately indifferent to, the excessive costs and incompetent practices related to their vendors, contractors, and subcontractors.

## XII.    ACCESS TO COURTS AND RELATED ISSUES

*COUNT 45: LONG PERIODS WITH NO ACCESS TO LAW LIBRARY*

101.    Plaintiffs contend that there are long periods of time in which PC prisoners had no access to the law library, legal materials, or the courts impeded or frustrated their ability to pursue non-frivolous claims, in violation of the Fourteenth Amendment, which under the circumstances incorporates all other constitutional rights. See *Lewis v. Casey*, 518 U.S. 343, 351-55 (1996). Plaintiffs Arthur, Briggs, Conn, Enyart, Literal, Morris, Rice, Wagner, and others similarly situated have had to forfeit non-frivolous claims, and even criminal appeals, as a direct and proximate result of Defendant's failure to provide access to the law library or legal materials sufficient to protect their constitutional rights. The most recent example includes a four-month period in late 2015/early 2016 in PC at ToCI had <u>no</u> access to any legal materials whatsoever, however general population inmates at ToCI had access to the law library every day.

*COUNT 46: LEGAL MATERIALS FOR PC AT ToCI GROSSLY INADEQUATE*

102.    Plaintiffs contend that the makeshift "law library" for PC prisoners is grossly inadequate, which violates the Fourteenth Amendment, and incorporates all other constitutional rights. See *Bounds v. Smith*, 430 U.S. 817, 828 (1977). ToCI does have a law library that exceeds constitutional requirements, however PC prisoners are not permitted access- yet general population inmates have virtually unlimited access. Instead, PC prisoners are only permitted access to a makeshift "law library" that contains a computer in a small room, and a dozen or so outdated and incomplete reference materials. Further only one PC prisoner can have access for a 1.5-hour period per day, 5 days a week- which is often cancelled or eclipsed by lunch or recreation. There is no reasonable penological cause for Defendants inability to assure Plaintiffs have equal access to the law library as do the general population inmates.

*COUNT 47: CASE LAW AND LAW BOOKS MUST BE CONSIDERED LEGAL PROPERTY*

103.     Plaintiffs contend that the exclusion of items such as case law, law books, and legal forms from their additional storage space for legal property violates the Eighth and Fourteenth Amendments. Currently, ODRC Police 59-LEG-01 only permits "pleadings, motions, memoranda, orders, judgments, and transcripts" in an additional storage container for legal materials beyond that which must be contained in their 2.4 cubic feet "personal property" container. Plaintiffs assert that case law, law books, and other excluded items are just as important in pursing relief in criminal and civil cases as are the pleadings, motions, etc., that are not excluded. Plaintiffs also contend that these additional storage containers for "legal property" should have the ability to be padlocked, as are the 2.4 cubic foot "personal property" containers.

*COUNT 48: FREE POSTAGE FOR INDIGENT LEGAL MAIL MUST INCLUDE ALL PARTIES*

104.     Plaintiffs contend that the free postage for indigent prisoner's legal mail does not include all parties to a case, in violation of the Eighth and Fourteenth Amendments. Currently, ODRC Policy 59-LEG-01 only provides free postage for an indigent prisoner's legal mail "to courts of law only." However, the Ohio Rules of Criminal [and Civil] Procedure, as well as Federal Rules of Civil Procedure, requires that all pleadings, motions, response, etc., filed with a court of law shall also be served upon all parties, or if they are represented a copy must be served upon their attorney.

*COUNT 49: FREE COPIES FOR INDIGENT LEGAL PLEADINGS*

105.     Plaintiffs contend that an indigent prisoner's copies that are required by court rules (relative to the pleading being filed at the time) are <u>not</u> free of cost, in violation of the Eight and Fourteenth Amendments. Currently, ODRC Policy 59-LEG-01 does not provide any free copies of pleadings that a court may require for itself, nor the copies that are required to be served upon

other parties or their attorney. The free copy requirement should also include one additional copy beyond the court and procedural rules requirements so that the indigent prisoner may have a copy for his record.

*COUNT 50: COPIES FOR LEGAL PLEADINGS MUST BE MADE REGARDLESS OF FUNDS*

106.     Plaintiffs contend that the Defendants refusal to make the necessary copies of their legal pleadings when they do not have enough funds available, and take the fund out of the following pay period when the funds are available, violates Eighth and Fourteenth Amendments. Because there is no means by which a prisoner may know when (or if) thee will be a need to make copies of legal pleadings, and because all prisoners receive pay on a monthly basis for performing a job at the institution in which is housed, it is reasonable to require the institution to "pre-charge" a prisoner's account for the cost of copies when there are insufficient funds at that time that copies are needed to meet a court's deadline.

*COUNT 51: TURNING PRIVATE LEGAL MAIL OVER TO OFFICIALS FOR COPIES*

107.     Plaintiffs contend that the practice of turning private and confidential legal materials over to prison officials so they can make copies and return with the copies at a later time/date violates the Fourth, Eighth, and Fourteenth Amendments. This is a requirement for PC prisoners at OCF and ToCI, however not for general population inmates, who may use the copier whenever they want as they have access to the copier that is specifically designated for inmate use in the law library. This is not the case for PC prisoners when they were at SOCF, who allowed PC prisoners some access to the copier at the law library as was provided general population inmates.

*COUNT 52: FORCED TO CHOOSE BETWEEN LAW LIBRARY, MEALS & RECREATION*

108.     Plaintiffs contend that the ongoing practice of forcing PC prisoners to choose between the law library, meals, and/or recreation (because the schedule often overlaps) violates the Eighth

45

and Fourteenth Amendments. This is especially apt when considering that there are no such scheduling conflicts for general population inmates within the same institutions housing the PC units.

## XIII. PAROLE BOARD AND RELATED CLAIMS

*COUNT 53: PAROLE BOARD CONTINUANCES WITHOUT SPECIFIC CRITERIA*

109.    Plaintiffs contend that the Parole Board is continuing their prison sentences (or "flopping" them) without specific criteria or constitutionally supported guidelines, in violation of the Fifth, the Eighth, and Fourteenth Amendments. Plaintiffs Bishop, Cox, Kiser, Maynard, McLoughlin, Meredith, and others similarly situated, have been required to serve excessive prison sentences that are grossly disproportionate to sentences served for the same offense committed by those sentenced after Senate Bill 2 was enacted in 1996. It is clear upon review of these "old law" prisoner's cases that not only is there a fundamental disparity in sentences and a violation of the equal protection of the law (and due process), but that the Parole Board's determinations are clearly arbitrary and capricious due to criteria that is vague and overbroad. See 'Against All Odds', Vol. 21, No. 4, pg. 6, citing that …

> "[t]here are over 3,500 prisoners incarcerated in Ohio who were conviced under the law in effect prior to 1997 ("old law"). All of these "old law" prisoners have served at least 16 years on their individual sentence terms of 15 years or less, and most are 50 or older. A majority of these "old law" prisoners could be released back into society without being a threat to the safety and security of the public."

*COUNT 54: PAROLE BOARD CONTINUANCES WITHOUT AN APPEAL PROCESS*

110.    . Plaintiffs (under the old law) contend that the Parole Board has continued their prison sentences without any appeal process being available to review their determinations for error, in violation of the Eighth and Fourteenth Amendments. Error corrections is fundamental and must be accomplished by an entity other than that making the decision being reviewed. Error

46

correction involves applying settled principals and criteria to a case's particular facts and circumstances, and is ultimately utilized to determine if the appellant receive justice at the hearing below. This process at its most basic must include (at the very least) the following two step analysis: (1) did the entity below err; and (2) if so, was the error prejudicial (i.e., did the error prevent the appellant from receiving justice such that the prison term ordered was not warranted).

*COUNT 55: NATURE OF OFFENSE AS CAUSE FOR CONTINUANCE*

111.    Plaintiffs (under the old law) contend that when the reason provided by the Parole Board as to why their prison sentence was continued is because of the "nature of the offense" violates the Fifth, Eighth, and Fourteenth Amendments. Further, another review should be mandated for those Plaintiffs who have received sentence continuances for this reason. Plaintiffs assert that the original sentencing court chose the original sentence based on the nature of the offense, thus it cannot be deemed reasonable to continue a prison sentence for the same reason. This count underscores the immediate need for the Parole Board to have specific criteria and guidelines provided by legislature., as asserted in Count 54 above, as well as an independent appeal process as outlined in Count 35.

*COUNT 56: PRISON RECORD SHOULD NOT BE CRITERIA FOR CONTINUANCE*

112.    Plaintiffs (under the old law) contend that the consideration of their prison record by the Parole Board in determining whether or not to continue their prison sentence violates the Eighth and Fourteenth Amendments. This is so because all prisoners sentenced after Senate Bill 2 are not subject to this consideration as to the length of their prison sentence. Otherwise, old law Plaintiffs cannot be said to have equal protection of the law, as guaranteed by the Fourteenth Amendment.

## XIV.   VISITATION RELATED ISSUES

*COUNT 57: PC VISITATION IS WITH GENERAL POPULATION INMATES*

113.     Plaintiffs contend that they are not separated from general population inmates during visits with family and/or their attorney, in violation of the Eighth and Fourteenth Amendments. All PC prisoners who wish to visit with their family are forced to be in the same open room together with general population inmates who are visiting with their families (and friends, gang members, etc.), where they can be seen, heard, and easily attacked by general population inmates. Further, they are often placed in the same holding rooms together before and/or after the visits. Plaintiffs Lewis, Harris, and others similarly situated, are precluded from visiting with their family or attorney because the risk of harm is too great, while others simply embrace the risk and hope for the best (and simply deal with the threats, harassment, and verbal abuse that is commonplace when in earshot of general population inmates).

*COUNT 58: ToCI HAS PC ONLY VISITING (ONLY THREE HOURS PER WEEK)*

114.     Plaintiffs contend that ToCI at least now offers a "PC only" visitation period, however it is only a 3-hour period and occurs only once a week (on Wednesdays), which violates the Eighth and Fourteenth Amendments. Plaintiffs assert that the "PC only" visitation should last the entire 6-hour period, and further, that an entire 6-hour period should be available on one of the two weekend days, so that PC prisoners with families who work standard hours are not being prejudiced by exclusion. It must be deemed reasonable for PC prisoners to have "PC only" visitation available on one weekday and one weekend day (every week) and anything less must be deemed unconstitutional.

## XV.    EXERCISE OF RELIGION AND RELATED ISSUES

*COUNT 59: PC IS OFTEN DENIED RELIGIOUS SERVICES AND MEALS*

115.    Plaintiffs contend that they are being denied religious services, religious meals, and group worship, in violation of the First, Eighth, and Fourteenth Amendments. See *Williams v. Lane*, 646 F.Supp. 1379, 1407 (ND I11. 1986), holding that the denial of group worship in protective custody was unconstitutional. Institutions recently housing PC prisoners (OCF, SOCF, and ToCI) have all offered weekly religious services and group worship for general population inmates (which include Catholic, Muslim, Christian, etc.), however, PC prisoners have had no such services available, or when they have been made available, they are sporadic, unplanned last-minute events, and not on day usually set aside for worship in accordance with a particular religion. Religious meals and holy days are only sporadically recognized, if at all. Defendants are aware of, but deliberately indifferent to, the exclusion of PC prisoners from religious services, religious meals, and group worship.

*COUNT 60: PC MIXED WITH GENERAL POPULATION DURING RELIGIOUS SERVICES*

116.     Plaintiffs contend that forcing them to be mixed with general population inmates during religious services violates the First, Eighth, and Fourteenth Amendments. Plaintiffs have been told that if they wish to have religious services or group worship, they must participate in the general population services, or not at all. It is axiomatic that PC prisoners are to be physically separated from general population inmates at all times.

*COUNT 61: ASATRU DENIED ITEMS PROVIDED BY ODRC FOR OTHER RELIGIONS*

117.    Plaintiffs contend that those among them who practice Asatru are being denied free literature and religious symbols in the amount being provided other religious free of cost from the ODRC, in violation of the First, Eighth, and Fourteenth Amendments. Plaintiff Chaffins and

Howland, for example, have asserted that records show that the ODRC has provided (free of cost) Bibles and crosses for Christians, Missals and rosaries for Catholics, and Qurans from Muslims. Plaintiffs contend that they should therefore be supplied The Poetic Edda and Thor Hammer medallions by the ODRC in an amount equal to the costs involved in the literature and religious objects being provided to other religions. However, Defendants have established deliberate indifference by denying Plaintiff's requests, and/or by declining an equivalent alternative to indigents practicing Asatru.

## XVI.   CLASSIFICATION AND SECURITY LEVEL ISSUES

*COUNT 62: SECURITY LEVELS RAISED AFTER OCF ESCAPE WITHOUT DUE PROCESS*

118.     Plaintiffs contend that their security levels were raised without due process following the escape of three PC prisoners from OCF, in violation of the Fifth, Eighth, and Fourteenth Amendments. Many of the Plaintiffs, after years of exceptional behavior, had their security levels reduced to level 2 (medium security), and some to level 1 (minimum security). Many of the plaintiffs, such as Burton, Fulton, Meredith, Penton, Sinclair, Wagner, and others similarly situated, had been at the lower security level for many years. However, immediately following the escape of three prisoners from the PC unites at OCF, all Plaintiffs received a notification dated 11/10/14 from Defendant Brian Wittrup stating that their security level was being increased to level 3 and they were being transferred to either SOCF or ToCI. This action violates the due process clause, and further, there was no meaningful appeal process attached to this action, which is an additional Fourteenth Amendment violation. These former security level 1 and 2 PC prisoners are, to this day, still being house in these same PC units with the level 3 and level 4 prisoners, and are themselves still classified as level 3. Defendants are aware of, but deliberately indifferent to, this uncosntiuttuional actions.

*COUNT 63: CLASSIFICATION CRITERIA FOR SECURITY VIOLATES DUE PROCESS*

119.    Plaintiffs assert that the criteria and procedures used to determine security levels within the PC units are vague and overbroad, are applied arbitrarily and capriciously, have been repeatedly changed and applied retroactively, and often based purely on administrative needs, in violation of the Eighth and Fourteenth Amendments. Plaintiffs can display exceptional behavior and have no incident reports for many ears and still not be reduced in security level, and their security level can (and has been) changed arbitrarily without being provided written reasons based on specific criteria, and they have no opportunity to defend themselves. In fact, meaningful scrutiny will show that the actual results tend to favor those who act out and receive conduct reports due to behavior violation prison rules. Significant also is that appeals are to the same person(s) who recommend the security level change (if provided at all).

*COUNT 64: PLAINTIFFS FORCED 0UT OF PC WITHOUT DUE PROCESS*

120.    Plaintiffs contend that a significant number of them have been forced out of PC and transferred to the inmate general population without meaningful due process, and despite an ongoing risk of serious physical harm, in violation of the Eighth and Fourteenth Amendments. Plaintiffs Dunkle, Hook, Kiser, Mann, Mayhew, Michael, Rice, Rogers, Teagarden, Thomson, Vititoe, Wagner, White, Wu, and other similarly situated, were all forced out of PC although the same circumstances substantiating an imminent risk of harm were still present. The determination was based on vague and overbroad criteria, and applied arbitrarily and capriciously. Furthermore, there was no meaningful appeal process, as all of the persons in the appeal process were part of the committee recommending transfer into the general inmate population. And none of said Plaintiffs received a written decision denying their appeal, but

instead were later told to pack up, as they were being transferred to a general population institution.

## XVII. DISCIPLINARY PROCEEDINGS

*COUNT 65: FORCED OUT OF PC FOR DISCIPLINARY REASONS*

121.    Plaintiffs contend that those among them who have been forced out of PC and into inmate general population for disciplinary reasons is in violation of the Eighth and Fourteenth Amendments. Plaintiff Mann, for example, was forced out of PC from OCF and then transferred into the inmate general population at SOCF as a result of a physical altercation with inmate Richdollar. Mann was in PC as a result of high profile cases involving elderly and child victims. His case has been profiled in network television programs such as 48 Hours, Dateline NBC, and Forensic Files. The Forensic Files episode has been shown four times this far in 2016 alone (On the Escape Channel). After being kicked out of PC, Mann was assaulted by general population inmates at SOCF on multiple occasions, while SOCF officials look on and even encourage (and cover up) the attacks. Mann's life, and the lives of others similarly situated, are at risk every day that they are kept out of PC. Mann and others like him have sought help from the Defendants and even other entities outside of the prison system, albeit to no avail. Defendants are aware of, but deliberately indifferent to, the fact that these Plaintiff's lives are at risk.

*COUNT 66: EXPUNGEMENT OF DISCIPLINARY CONVICTIONS*

122.    Plaintiffs contend that many among them have been subjected to wrongful disciplinary convictions that resulted in significant and substantial collateral consequences, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Plaintiff McLoughlin and at least ten others, for example, were wrongfully convicted of extortion (and other offenses) involving the same former PC prisoner. The evidence will show that the convictions were wrongful, and in

McLoughlin's case (and others similarly situated) the convictions were used by the Parole Board as cause to continue their prison sentence instead of considering release on parole. See *Wolf v. McDonnell*, 418 U.S. 539, 565 (1974), holding that the federal court can expunge a wrongful disciplinary conviction that may affect parole eligibility. Plaintiffs Barney, Lanier, and Johnson W., for another example, have also suffered collateral consequences for wrongful disciplinary convictions, which must be expunged under the circumstances cited below. See *Hayes v. Thomson*, 637 F.2d 483, 493 (7th Cir. 1980), holding that expungement was warranted where the due process violations "significantly affected [the inmates] ability to demonstrate his innocence." And see *Wilson v. Jones*, 430 F.3d 1113, 1124 (10th Cir. 2005), holding that the conviction should be expunged when there was no evidence to support the conviction.

*COUNT 67: NO APPEAL FOR CONDUCT REPORT RESOLVED BY HEARING OFFICER*

123.    Plaintiffs contend that there is no appeal process for a Conduct Report that is resolved by the Hearing Officer under OAC § 5120-9-07, in violation of the Fourteenth Amendment. All disciplinary actions within the ODRC typically being with a written Conduct Report. The Hearing Officer (usually the unit Sergeant) then brings the accused before him or her to be advised of the Conduct Report, which is typically turned over to the Rules Infraction Board for trial on the accusation, and to impose punishment where warranted. However, in some instances, the Hearing Officer can resolve the Conduct Report, determine guilt or innocence, and impose punishment if warranted. When the Hearing Officer resolves the Conduct Report, there is no appeal process available as there is when the Rules Infraction Board resolves the Conduct Report. This lack of appeal violates due process.

## XVIII. SEARCHES, SEIZURES, AND PRIVACY ISSUES

*COUNT 68: SOCF MASS STRIP SEARCHES IN GYMNASIUM*

124.     Plaintiffs contend that the mass strip searches conducted openly in from of all PC prisoners in the gymnasium at SOCF violates the Fourth, Eighth, and Fourteenth Amendments. See *Mays v. Springborn*, 575 F.3d 643, 649-50 (7th Cir. 2009); and *Hutchins v. McDaniels*, 512 F.3d 193, 195-96 (5th Cir. 2007). This practice is designed to be humiliating and demeaning, albeit unreasonably and unnecessarily so. This practice encourages (and has resulted in) inmate-on-inmate verbal, physical, and sexual abuse. This practice is not provided for ODRC guidelines, and in fact when mass strip searches have been deemed necessary at OCF and ToCI, they were conducted individually behind a privacy barrier. Defendants are aware of, and deliberately indifferent to, this unconstiutuional practice at SOCF (as well as countless others).

*COUNT 69: MULTIPLE STRIP SEARCHES DURING PC VISITATION*

125.     Plaintiffs contend that the many strip searches to which they are subjected at OCF and ToCI during visitation with family violates the Fourth, Eight, and Fourteenth Amendments. Plaintiffs are strip searched upon arrival to family visitation and before entering the visiting room. Plaintiffs are gain strip searched every time they use the restroom throughout the visit and prior to returning to the PC unit. It is clear that only the first and last strip search can reasonably be said to serve a security or penological interest, and that all others are designed to harass- thus they ae unconstitutional. See *Hodges v. Stanley*, 712 F.2d 34, 35 (2nd Cir. 1983); and *Morgan v. Ward*, 699 F.Supp. 1025, 1051-54 (ND NY 1988).

*COUNT 70: DNA SAMPLES TAKEN BY ODRC UPON INTAKE*

126.     Plaintiffs contend that the DNA samples taken from them by the ODRC upon arrival into the prison system violates the Fourth, Eighth, and Fourteenth Amendments. Defendants have

acted with a search warrant when obtaining the DNA from Plaintiffs, nor are they required to justify which of the exigent circumstances necessitated their warrantless search. Further, the Plaintiffs were not provided and opportunity to defend themselves against the warrantless search before the trier of fact in a proper hearing. See *Roe v. Marcotte,* 193 F.3d 72, 81-82 (2nd Cir. 1999); and *Friendman v. Boucher*, 568 F.3d 1119, 1124-30 (9th Cir. 2009). See also, *Katz v. United States,* 389 U.S. 347, 357 (1967).

## XIX.  PERSONAL PROPERTY CLAIMS

*COUNT 71: PROPERTY DESTROYED AT SOCF AFTER TRANSFER FROM OCF*

127.    Plaintiffs contend that SOCF withheld and ultimately destroyed much of their property upon transfer to SOCF following the escape of three PC prisoners from OFC, in violation of the Fifth, Eighth, and Fourteenth Amendments. See *Hudson v. Palmer*, 468 U.S. 517, 530 (1984); *Collins v. Goord*, 438 F. Supp.2d 399, 418-19 (SD NY 2006). After three PC prisoners escaped from OCF, the entire PC units was transferred to SOCF where they were mass punished for a year before being sent to ToCI. After arriving at SOCF, much of the Plaintiffs property was never turned over to them from SOCF officials and was later destroyed. None of said property was contraband. In fact, many of the Plaintiffs had actually received said property at SOCF when PC was housed there prior to 2012. Plaintiffs were not permitted any due process rights in the destruction of their property, nor did SOCF store the property until they left a year later, or provide opportunity for Plaintiffs to send the property home. Plaintiffs Brown D., Enyart, and Morris, for example, had their typewriters, accessories, and/or legal books and other legal property kept from them and later destroyed in retaliation for filing grievances.

*COUNT 72: INDIVIDUAL PERSONAL PROPERTY CLAIMS*

128.     Plaintiffs contend that Defendant have taken property from them during searches (that was later destroyed) in violation of the Fifth, Eighth, and Fourteenth Amendments. See *McRae v. Hankins,* 720 F.2d 863, 869 (5th Cir. 1983); and *Bryant v. Barbara*, 717 P.2d 522, 524 (Kan.App. 1986). Plaintiff Morris, for example, had property that was seized during disciplinary proceedings at OCF that was ultimately destroyed without his knowledge while he was in the hole pursuant to disciplinary proceedings. Plaintiff Enyart, as another example, had property stolen when OCF block officers unlocked his cell door when he was out of the block as he had been summoned to the shift office. Plaintiff Torok, as yet another example, had property taken and destroyed during a mas PC unit search at OCF, and was provided no paperwork whatsoever- the items were simply missing when the PC prisoners were allowed to return to the unit following the search. The loss of property at the hands of the Defendants in violation of their constitutional rights.

## XX.     CORRESPONDENCE, COMMUNICATION, AND PUBLICATIONS

*COUNT 73: EMAILS AND ATTACHMENTS REJECTED WITHOUT DUE PROCESS*

129.     Plaintiffs contend that their emails (and the attachments thereto) are being rejected/deleted before they are received without due process, in violation of the First Eighth, and Fourteenth Amendments. Recently ODRC permitted the subcontractor Jpay to offer the Plaintiffs goods and services, such as emails, and devices to download/upload them. However, before emails (and attachment's) are made available to the Plaintiffs, they are screened by prison officials, who arbitrarily and capriciously reject or otherwise delete the email (and/or attachment). The criteria utilized by said prison official is vague and overbroad, and Plaintiffs have no process by which they can challenge whether or not an email (or attachment) is

contraband or otherwise properly rejected for a reasonable penological interest.  In short, the email (and attachment) must be treated as any other correspondence received by way of a postal service such as the United States Mail. As the Supreme Court of the United States held in *Procunier v. Martinez*, 416 U.S. 396, 417-19 (1974), the right to correspond is a liberty interest protected by due process, and prisoners are entitled to notice when an incoming on outgoing correspondence is rejected, a reasonable opportunity to protest for the author, and referral of complaints to someone other than the censor.

*COUNT 74: PUBLICATIONS REJECTED WITHOUT DUE PROCESS*

130.    Plaintiffs contend that their publications (books, newspapers, magazines, etc.) have been rejected and otherwise censored in violation of the First, Eighth, and Fourteenth Amendments. This practice has been done without due process and pursuant to vague and overbroad criteria that is applied arbitrarily and capriciously. Plaintiff Wagner, for example, was denied any and all publications intended for gay lifestyles, even though there was no nudity in the publications whatsoever. And as to nude publications, Plaintiff Tharp (for example) was advised that nude publications could be received as long as they did not include any penetration images. However, his Penthouse magazines were rejected, despite there clearly being no such images shown in their magazines. These Plaintiffs, and others similarly situated, have unlawfully suffered censorship "solely because [the publication] content is religious, philosophical, political, social, or sexual, or because its content is unpopular or repugnant." *Thornburgh v. Abbott*, 490 U.S. 401, 404-05 (1989).

## XXI.   TOBACCO PRODUCTS

*COUNT 75: DIRECTOR DOES NOT HAVE AUTHORITY TO REGULATE TOBACCO*

131.    Plaintiffs contend that former ODRC Director Defendant Terry Collins did not have lawful authority to ban tobacco from the ODRC, in violation of the Eighth and Fourteenth Amendments. Plaintiffs assert that the removal of tobacco products from prison commissaries, and the ban of tobacco use on prison grounds (statewide) does require legislative action. This, only the General Assembly has authority to regulate tobacco within the ODRC.

*COUNT 76: DIRECTOR'S CLAIMS NOT SUPPORTED BY PROPER MEDICAL STUDY*

132.    Plaintiffs contend that former ODRC Director Defendant Terry Collis made claims as cause for the tobacco ban that were unsupported by the required criteria, in violation of the Eighth and Fourteenth Amendments. Defendant Collins cited as cause for the tobacco ban the need to reduce health care costs. However, Defendant Collins' conclusion is purely speculative. He does not offer conclusive medical findings form an independent study of prisoners under his supervision showing how their health was directly impacted by their used of specific tobacco products, and how that translated into additional health care costs. Therefore, Defendant Collins' claims are arbitrary and capricious, and based on criteria that is vague and overbroad. See *Simba v. Walker,* 2007 WL 529998 (WD NC No. 1:02-CV-211-03-MU) at *25-32; and, generally see *Helling v. McKinney*, 509 U.S. 25, 113 S.Ct. 2475 (193). Defendants are aware of, but deliberately indifferent to, the constitutional violations suffered by the Plaintiffs from these actions of Defendant Collins.

*COUNT 77: TOBACCO BAN INCREASED VIOLENCE AND STRENGTHENED GANGS*

133.    Plaintiffs contend that the tobacco ban implemented by former ODRC Director Defendant Terry Collins has resulted in serious harm and more dangerous conditons of

confinement, in violation of the Eight and Fourteenth Amendments. See *Dayton Daily News* article titled '*Officials are Examining if Increases in Violence is Tied to Smoking Ban'* published 01/21/12, which states that since the smoking ban, tobacco is now "flooding Ohio's prisons, spurring a new wave of violence as rival gangs' battle for control of the black market." The article cites that since the ban, "the frequency of violent disturbances has doubled…leading Ohio's top prison officials to launch a study." Plaintiffs further contend that the tobacco ban cannot reasonably be alleged to reduced health care costs because tobacco is still available, however it is now supplied on the black market instead of prison commissaries. This means that any impact on health care costs can only reasonably be said to increase such costs, as the tobacco is not consumed through filtered cigarettes but is now an inferior grade loose leaf tobacco that is smoked in rolled newspaper or bible paper.

## XXII.  MISCELLANEOUS ISSUES (LAUNDRY SERVICE, MANDATORY COSTS, ETC.)

*COUNT 78: LAUNDRY SERVICE DISCONTINUED*

134.    Plaintiffs contend that Defendants have discontinued the laundry services previously available to them, in violation of the Eighth and Fourteenth Amendments. See *Toussaint v. Rushen*, 533 F.Supp. 1365, 1371, 1379, 1385 (ND Cal. 1983), holding that the lack of regular laundry service is unconstitutional. PC prisoners previously worked in the prison laundry room. All prisoners in the PC units were provided the opportunity to have whites laundered on two different days per week, ad colors laundered on two different days per week. Blankets were laundered once per month-all of which was at no cost to the Plaintiffs. However, recently the Defendants discontinued this service, and now force Plaintiffs to purchase laundry detergents and supplies, and require them to utilize insufficient washer/dryer units within each block. Said

units are unsanitary, do not provide water hot enough for sterilization (as did former industrial units) and contribute significantly to the noise and other unconstiutuional conditions of confinement.

*COUNT 79: PC FORCED TO BUY LAUNDRY PRODUCTS*

135.    Plaintiffs contend that they are now being forced to pay for laundry products to launder their clothing and bedding (etc.), in violation of the Eighth and Fourteenth Amendments. Plaintiffs assert that if it is deemed acceptable to discontinue prion laundry service (as argued in Count 79 above), then detergents and other products necessary to self-launder clothing, bedding, etc., must be provided to Plaintiffs at no cost.

*COUNT 80: PC FORCED TO PAY FOR ELECTRICITY*

136.    Plaintiffs contend that they are now being charged $1.00 per month for electricity usage, in violation of the Eighth and Fourteenth Amendments. Plaintiffs assert that this figure is arbitrary and based on vague criteria, and does not relate to any specific actual usage of electricity. Defendants recently started assessing the cost against Plaintiffs, and have yet to provide any statement showing specific electric usage for a specific user-nor could they as many Plaintiffs are double celled, thus even if Defendants were able to isolate actual electrical usages for a particular cell (which they cannot), there would be no means to ascertain which of the two prisoners used what portion of the electric actually used.

*COUNT 81: FORCED TO PAY FOR SUNDRIES AND HYGIENE PRODUCTS*

137.    Plaintiffs contend that they now have to pay for sundries and hygiene products to Plaintiffs, such that now the only item provided is one roll of toilet paper per week. As the Seventh Circuit held in the case cited above, "the right to toothpaste as an essential hygienic product is analogous to established right to a nutritionally adequate diet." (394 F.3d 481-82).

60

*COUNT 82: FORCED TO PAY FOR ToCI MANUAL*

138.    . Plaintiffs contend that they were deprived of the ToCI manual upon arrival, and were told that if they wanted one it would cost $5.00, in violation of the Eighth and Fourteenth Amendments. Plaintiffs assert that an institution's manual should be provided free of cost, and should not count towards their 2.4 cubic foot personal property allotment. In other word, the ToCI manual, as well as all stated issued items that Defendants require a PC prisoner to have, should be excluded from the 2.4 cu. Ft. property requirements.

*COUNT 83: $17.00 PER MONTH 'STATE PAY' INSUFFICIENT FOR NEW COSTS*

139.    Plaintiffs contend that the $17.00 per month that they receive for working at the institution is insufficient to pay for all new costs recently added (see Counts 7-17 and 80-83 for example), in violation of the Eight and Fourteenth Amendments. Many Plaintiffs have court costs, restitution, child support, etc., take out of their $17.00 per month pay before they have the opportunity to purchase essential goods and services. Others have been forced to choose between essential hygiene supplies and essential legal supplies. See *Gluth v. Kangas,* 951 F.2d 1504, 1508 (9th Cir. 1991). The point being made here is adequately summarized in the case *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996) in which the Eighth Circuit held that the "deprivations of adequate hygiene supplies violates inmates' Eighth Amendment rights…Prisons may either regularly proved these supplies to inmates free of charge, or they may give inmates a sufficient allowance with which to buy them."

*COUNT 84: INDIGENT STATUS SHOULD BE RAISED NOT LOWERED*

140.    Plaintiffs contend that the recent reduction for indigent status from $12.00 to $9.00 per month violates the Eighth and Fourteenth Amendments.   Defendants recently changed the qualification for indigent status. Where before a prisoner qualified for indigent status if he

received $12.00 or less in a 30-day period. Give that the cost of living index always increases, it is axiomatic that indigent status should increase accordingly. Regardless, Plaintiffs contend that a prisoner's indigent requirements be more reasonably in accordance with any non-prisoner indigency requirements. Thus, it is contended herein that any prisoner who has less than $5,000.00 per year pass through their prison account must be deemed indigent.

*COUNT 85: EXCESSIVE FEE TO DEPOSIT FUND IN PRISON ACCOUNT*

141.    Plaintiffs contend that they are being charged unreasonable and excessive fees to directly deposit fund in their prison account through the ODRC offenderconnect.com service, in violation of the Eighth and Fourteenth Amendments. Although the fee assessed is based on the amount deposited, it generally constitutes a fee of approximately 10% of the amount deposited. The fee should be fixed and consistent, ad should be in line with the Jpay and ODRC Kiosk fees which ae a fixed amount of $3.00 per transaction.

## XXIII. RELIEF REQUESTED

Wherefore, Plaintiffs request that the Court grand the following relief:

### A.  DECLARATORY RELIEF

Issue a declaratory judgment for each of the counts herein stating that the acts and omissions of the Defendants described in each count of this Complaint violated the Plaintiffs rights under the Constitution and laws of the United States.

### B.  INJUNCTIVE RELIEF

Issue an injunction ordering the Defendants to immediately correct all constitutional violations described in each count of this Complaint in order to restore all rights and privileges to which the Plaintiffs are entitled under the Constitution and laws of the United States.

### C.  COMPENSATORY DAMAGES

Award compensatory damages jointly and severally against the Defendants for all loss, overages, and injuries suffered by the Plaintiffs in amounts commensurate with similar loss, overages, and injuries suffered by similar plaintiffs under similar circumstances.

D.  PUNITIVE DAMAGES

Award punitive damages against the Defendants for all loss overages, and injuries suffered by the Plaintiffs in amount's commensurate with similar loss, overages, and injuries suffered by similar plaintiffs under similar circumstances.

E.  NOMINAL DAMAGES

Award nominal damages against the Defendants in amounts commensurate with that awarded to similar plaintiffs under the similar circumstances.

F.  COSTS OF THIS ACTION

Award the costs of this action against the Defendants, including, but not limited to attorney's fees.

G.  DEFAULTED CASES AND CLAIMS

Issue an order for the reinstatement of all Plaintiff's cases, claims, etc., that were defaulted, forfeited, or dismissed as untimely due to violations of the right of access to courts.

H.  PRISONER RELEASE ORDERS

1.  Issue prisoner release orders that directs the release of all currently doubled celled in PC units to be transferred to other PC units so that all PC units will ultimately be single celled.

2.  Issue prisoner release orders that directs the release of all Plaintiffs sentenced prior to Senate Bill 2 who have served prison sentences in excess of the maximum sentence

available for the same offense after Senate Bill 2 was enacted, as well as those

Plaintiffs who have served 150% or more of their minimum sentence.

I.   PROHIBITORY INJUNCTION

Issue a prohibitory injunction ordering that PC units may not be housed within the

Southern Ohio Correctional Facility (SOCF) in the future.

J.   EQUITABLE RELIEF

Grant other such relief as it may appear that Plaintiffs are entitled, or such relief that the Court

deems just and equitable under the particular circumstances of the instant action.

Respectfully Submitted,

**s/ Eric Allen**

_____

Eric J. Allen (0073384)
Law Offices of Eric J. Allen
4605 Morse Road, Suite 201
Gahanna, Ohio 43230
Ph. 614-443-4840
Fax. 614-573-2924
eric@eallenlaw.com

**I.      VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I declare and verify under penalty of perjury under the

law of the United States of America that the foregoing is true and correct. Executed

on  August 23, 2017

**s/ Eric Allen**

_____

Eric J. Allen (0073384)